THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
KIRK HUGHES, Appellant.

Fourth Department, July 9, 1982

**APPEARANCES OF COUNSEL**

*Gerald T. Barth* (*Eric Alderman* of counsel), for appellant.

*Richard Hennessy* (*John Cirando* of counsel), for respondent.

**OPINION OF THE COURT**

HANCOCK, JR., J.

The use of hypnosis has not gained general acceptance in the scientific community as a reliable method of restoring a witness' recollection of an event. We hold, therefore, that the testimony of a witness concerning hypnotically produced recall is, as a matter of law, inadmissible in a criminal trial in this State.

I

Whether such testimony should be admitted, a question apparently not before considered in any appellate court in New York, arises in the context of an appeal from convictions for rape, first degree, burglary, first degree, and assault, second degree. The victim, Nancy Simmons, was unable to recall the details of the incident including the

identity of her attacker.[1] At the suggestion of an investigating police officer, she agreed to be hypnotized. Prior to the first hypnosis session, Mrs. Simmons learned that the police suspected the defendant. During and after this session, which took place in the Public Safety Building and at which, in addition to the hypnotist, the victim's husband and two investigating police officers were present, the victim named defendant as the rapist and remembered other details. During a second session with the same hypnotist, she recalled nothing additional. Subsequently, Mrs. Simmons on her own initiative contacted a psychiatrist, Dr. Goldfarb, who hypnotized her two more times; he encountered a new memory block which prevented her repetition of the identification previously given under hypnosis. Later, Dr. Goldfarb administered sodium pentothal, and the victim was then able to remember not only that it was defendant who had assaulted her but also that defendant's brother had been present during part of the incident and had tried to stop him.

At a lengthy pretrial hearing concerning the admissibility of Mrs. Simmons' testimony, three expert witnesses testified. The prosecutor called Dr. Land. Although he stated that the hypnotic procedures he employed were not biased or suggestive, Dr. Land conceded: that there is no general agreement in the profession as to the reliability of hypnosis as a means of gathering evidence for courtroom purposes; that suggestions made before, during or after hypnosis can affect the subject's recall; that a subject can create a memory where none previously existed; that a subject will generally be convinced of the accuracy of such false memory; and that his testimony will be given with confidence and have the ring of truth. Neither of the other two expert witnesses — Dr. Goldfarb, called by the People, and Sheldon Malev, professor of clinical psychology, sworn by the defense — disputed Dr. Land's testimony on these points.

---

1. Apparently the victim had named the defendant twice prior to hypnosis, stating that she "saw" him or "remembered" him. She did not, however, state that it was he who had attacked her but rather maintained that she could not remember who it was who had done so.

In a written decision following the hearing, the trial court, relying on *Harding v State* (5 Md App 230, cert den 395 US 949) and *United States v Adams* (581 F2d 193, cert den 439 US 1006), held that "testimony, which is hypnotically induced recollection, is not inadmissible as a matter of law" (*People v Hughes,* 99 Misc 2d 863, 871) and ruled that Mrs. Simmons was competent to testify as to her posthypnotic recall.

At trial, Mrs. Simmons testified to her recollection of various details recalled after undergoing hypnosis, including her identification of defendant and the presence of defendant's brother during part of the incident.

## II

County Court's ruling that hypnotically produced testimony is not legally inadmissible runs counter to the thrust of recent holdings in other jurisdictions that such evidence should not be permitted absent a finding that it satisfies the so-called *Frye* test (*Frye v United States,* 293 F 1013) or comparable standard, viz., that before the results of a scientific procedure may be used as evidence, it must be established that the procedure has gained general acceptance in the scientific community (see, e.g., *Arizona v Superior Ct.,* __ Ariz __, 644 P2d 1266; *State v Mena,* 128 Ariz 226; *People v Shirley,* 31 Cal 3d 18; *Polk v State,* 48 Md App 382; *People v Tait,* 99 Mich App 19; *State v Mack,* __ Minn __, 292 NW2d 764; *Commonwealth v Nazarovitch,* __ Pa __, 436 A2d 170). It is significant, we think, that even Maryland's high court, which decided *Harding v State* (*supra*) — for many years the leading case permitting such testimony and holding that the fact of hypnosis of the witness "goes to the weight, not the admissibility" of the evidence[2] — has recently repudiated *Harding* and held

2. It should be noted that the Maryland court in *Harding v State* (5 Md App 230, cert den 395 US 949) apparently accepted a statement of the psychologist who hypnotized the complainant which has subsequently been completely rejected in the scientific community, viz., that hypnosis *does not* render the subject particularly receptive to suggestion. Thus, the continued soundness of the holdings in *Harding* and in *United States v Awkard* (597 F2d 667, 669, cert den 444 US 885) and *United States v Adams* (581 F2d 193, 198, cert den 439 US 1006), both of which rely on *Harding,* is subject to question (see

that admissibility of hypnotically generated testimony must be determined by application of the *Frye* standard (see *Polk v State, supra*). New York has adopted a test identical to the *Frye* rule in considering the admissibility of evidence produced by various scientific procedures, viz., whether the reliability of the results of a procedure is generally acknowledged in the scientific community (see *People v Middleton,* 54 NY2d 42, admitting bite mark evidence; *People v Leone,* 25 NY2d 511, excluding results of a polygraph test; *People v Forte,* 279 NY 204, holding pathometer exam readings not admissible; *People v Tarsia,* 67 AD2d 210, affd 50 NY2d 1, excluding results of a voice stress test). We hold that the same test should be applied here.

### III

Out-of-State courts which have applied the *Frye* standard to hypnotically produced testimony have generally agreed that such testimony has not been accepted as reliable in the scientific community, citing the following conclusions of recognized authorities in the field.

(1) The subject under hypnosis becomes extremely receptive to suggestions perceived to have come from the hypnotist, even suggestions which were unintentionally or unwittingly communicated. He is also susceptible to suggestions received, whether before or during the hypnosis, from other persons who may have communicated with the witness such as, for example, investigating police officers.[3]

(2) The subject feels compelled to please the hypnotist and thus, seeking to co-operate, may "fill in" missing details through "confabulation", or fantasy.[4]

---

Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal L Rev 313, 322-323).

**3.** See *People v Shirley* (31 Cal 3d 18, n 46) and authorities cited therein (*State v Mack,* __ Minn __, 292 NW2d 764, 768; Diamond, *op. cit.,* p 333).

**4.** See *State v Mena* (128 Ariz 226, 229, quoting Spector and Foster, Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?, 38 Ohio St L J 567, 578); *People v Shirley* (31 Cal 3d 18, __, *supra*). Diamond, *op. cit.,* p 335 states: "[T]he hypnotically recalled memory is apt to be a mosaic of (1) appropriate actual events, (2) entirely irrelevant actual events, (3) pure fantasy, and (4) fantasized details supplied to make a logical whole."

(3) The suggestions adopted by the subject and the details "filled in" by confabulation may create a new memory or "pseudo memory" which the subject accepts as real and which may become so fixed in his mind that effective cross-examination becomes a virtual impossibility.[5]

(4) Once a subject has been hypnotized, there is no known reliable method enabling anyone — subject, hypnotist, expert witness, Judge or Jury — to distinguish "pseudo memory" from accurate memory which has been enhanced by hypnosis.[6]

While the authorities are not in complete agreement,[7] it is noteworthy, we believe, that even the People's expert, Dr. Land, generally concurred with the above points including, most significantly, the occurrence of confabulation and the difficulty of distinguishing real from "pseudo" memory.

From our reading of recent decisions in the field and of recognized authorities (see ns 3-6, *supra*) we are persuaded that hypnotically produced testimony is not generally accepted in the scientific community as reliable and that it should, therefore, be inadmissible (see *People v Middleton,* 54 NY2d 42, *supra; People v Leone,* 25 NY2d 511, *supra; People v Forte,* 279 NY 204, *supra; People v Tarsia,* 67 AD2d 210, affd 50 NY2d 1, *supra*).

IV

We must comment briefly on the standards proposed in the dissent for the use of hypnotically produced testimony. Such testimony should be accepted, it is suggested, "when there are facts establishing that the witness did not confabulate." Corroboration, as the dissenter views it, should be "the linchpin of admissibility." In other words, what ap-

---

**5.** See *People v Shirley* (31 Cal 3d 18, __, *supra*); *State v Mack* (*supra,* p 769, see excerpt from Dr. Martin Orne's testimony, n 10); *Commonwealth v Nazarovitch* (__ Pa __, __, 436 A2d 170, 174-175); Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal L Rev 313, 333-338, 340; Spector and Foster, *op. cit.,* p 593.

**6.** See *People v Shirley* (*supra,* pp __, __); *State v Mack* (*supra,* p 769); *State v Hurd* (86 NJ 525, 538-539, quoting Orne, The Use and Misuse of Hypnosis in Court, 27 Int J Clinical & Experimental Hypnosis 311, 317-318); Diamond, *op. cit.,* pp 337, 339-340.

**7.** For example, New Jersey's Supreme Court, applying New Jersey's version of the *Frye* test, held that hypnotically generated evidence was admissible in certain instances, concluding that "[i]f it is conducted properly and used only in appropriate cases, hypnosis is generally accepted as a reasonably reliable method of restoring a person's memory." (*State v Hurd, supra,* p 538; see, also, Spector and Foster, *op. cit.*)

pears to be true should be admitted; what seems false excluded.

Reliability of hypnotically generated testimony, not its plausibility, should determine whether it is accepted. Polygraph evidence (see *People v Leone, supra*), voice stress test results (see *People v Tarsia, supra*), and pathometer exam readings (see *People v Forte, supra*) are disallowed because the procedures used have not been generally accepted in the scientific community as producing reliable results; such evidence does not become admissible because other evidence corroborates it. For the court to admit what seems to be true and exclude what does not subverts the traditional role of jurors as the exclusive judges of the facts. With corroboration "the linchpin of admissibility", false hypnotically produced testimony based on "pseudo memory" which happens to coincide with other evidence could come in. Crucial reliable but uncorroborated testimony would be barred. Consequences of such a rule are readily imagined.

If and when hypnosis becomes generally accepted in the scientific community as a reliable method of restoring memory, testimony based on hypnotic recall should in a proper case be admitted. The jury, not the court, should then determine whether such testimony is worthy of belief. Until then, it should be excluded.

Although on a retrial the testimony produced through hypnosis must be excluded, it does not follow that because she has been hypnotized, Mrs. Simmons is incompetent to testify to facts which she was able to recall prior to undergoing hypnosis (see *Arizona v Superior Ct.,* __ Ariz __, supplemental opinion, 644 P2d 1279, 1296; cf. *State v Mack,* __ Minn __, 292 NW2d 764, 771, *supra*).

We find no error in the other evidentiary rulings of the trial court challenged on appeal.

The judgment should be reversed and a new trial granted.

DOERR, J. (dissenting). In my view a rule of per se inadmissibility is "unnecessarily broad" and results in the exclusion of worthwhile evidence (*State v Hurd,* 86 NJ 525). Hypnosis is neither supernatural nor magical but "a

reduced state of consciousness" (Dillof, Admissibility of Hypnotically Influenced Testimony, 4 Ohio North L Rev 1, 3) in which the subject is able to relax and thereby, in some cases, recall events that the conscious mind has repressed. The past decade has seen a hypnosis "boom" (Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Cal L Rev 313, 341) in law enforcement, resulting in much abuse of the technique. For example, some witnesses have been hypnotized by law enforcement personnel rather than by impartial professionals, and convictions have been obtained with no corroborating evidence (see Diamond, *op. cit.,* pp 324-325). Hypnosis has also been used to refresh the recall of a person inebriated at the time of the crime (*People v Shirley,* 31 Cal 3d 18). These and other inappropriate uses of hypnosis have led many courts to adopt a rule of per se inadmissibility. Other courts have rejected this approach by holding that the evidence is admissible if the hypnotic session was conducted in accord with various procedural safeguards (*State v Hurd, supra; State v Greer,* 609 SW2d 423, vacated on other grounds 450 US 1027; *People v Smrekar,* 68 Ill App 3d 379; *United States v Adams,* 581 F2d 193, cert den 439 US 1006; see, also, *People v Lucas,* 107 Misc 2d 231; *People v McDowell,* 103 Misc 2d 831, 834-836). Although I recognize the danger of confabulation and the limitations of procedural safeguards, I would not rule out hypnotically refreshed testimony in those cases where there is independent verification that the subject has not confabulated but has, in fact, recalled accurately who the assailant was.

The majority apply the *Frye* rule (*Frye v United States,* 293 F 1013) to hypnotically refreshed testimony and conclude that there is no general acceptance of the reliability of such evidence. I have some doubts as to whether that rule should apply, since the evidence being presented is not an expert testifying as to the results of a scientific test but rather the witness testifying as to her own recollection, albeit a refreshed one. Assuming, *arguendo,* that the *Frye* rule should apply, my application of it to the facts at hand results in a different conclusion, for there is general acceptance in the scientific community that hypnosis can restore the subject's memory, and there is general agreement that

the key to determining whether the subject confabulated or recalled the event accurately is independent verification. A leading expert in the field, Dr. Martin Orne, has summed up this view by stating that: "hypnosis may be useful in some instances to help bring back forgotten memories following an accident or a crime while in others a witness might, with the same conviction, produce information that is totally inaccurate * * * As long as this material is subject to independent verification, its utility is considerable and the risk attached to the procedure minimal" (*State v Hurd, supra,* p 539, citing Orne, The Use and Misuse of Hypnosis in Court, 27 Int J Clinical & Experimental Hypnosis, 311, 317-318). Even the leading proponent of the per se inadmissibility rule, Dr. Bernard L. Diamond, concedes that hypnosis can, in some cases, restore memory (Diamond, *op. cit.,* p 340). A review of the many cases discussing this topic reveals that most of the courts place undue emphasis on the opinions of Dr. Diamond to the exclusion of other experts. However, "the test is not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally acceptable as reliable" (*People v Middleton,* 54 NY2d 42, 49). Hypnosis to refresh a memory is generally accepted as reliable when there is independent verification of the fact recalled, and thus I would admit hypnotically refreshed testimony when there are facts establishing that the witness did not confabulate. While corroboration has sometimes been listed as a procedural safeguard (see, e.g., *People v Lucas,* 107 Misc 2d 231, 236, *supra*), I would make corroboration the linchpin of admissibility.

Turning to the facts at hand, there was ample corroboration that the victim accurately identified her attacker and not some innocent party. A neighbor saw defendant enter the apartment building where he and the victim both lived at 10:10 P.M. About five minutes later, two other neighbors heard screams coming from the victim's apartment. One of the neighbors heard the victim's four-year-old son screaming and heard the victim cry out, "What are you doing here? What do you want? Get out." She then heard a thumping noise, like something falling down the back stairs. About 45 minutes later, a fourth neighbor who lived

across the street was called outside by her husband who was leaving for work at 10:55 P.M. when he heard the victim's son crying. This neighbor and her nephew stood outside and saw the child come outside, look around, and go back inside. A few minutes later, at approximately 11:05 P.M., they saw defendant emerge from the victim's back yard. Defendant, wearing no shirt, looked up and down the street and then cut through the shrubbery and entered the apartment house. The next day, when police questioned defendant, he had scratches on his back, dirt on his elbows, and bruises on his right knee and hands. There were grass stains on the pants and semen on the underwear that he had been wearing the day before. While the victim was in the hospital she told the investigating officer that she kept remembering defendant, but did not know why. In view of the evidence placing defendant in the victim's back yard at the precise time she was being raped and coupled with the physical evidence showing that defendant had been in a scuffle in the outdoors, there is ample independent verification that the victim did not confabulate but did, in fact, recall who her attacker was. In view of the corroborating evidence, the victim's identification should have been admissible because the hypnotic session was conducted in a fair and impartial manner[*] and was reliable under the totality of the circumstances (*Manson v Brathwaite,* 432 US 98, 114; *People v Graham,* 67 AD2d 172, 177).

The majority feel that the admissibility of a hypnotically refreshed identification should not hinge on corroboration. They note that corroboration does not render admissible other evidence, such as polygraph tests. However, polygraphs, voice stress tests and the like are generically different from hypnotically refreshed testimony. The former are "tests"; therefore, they can have no probative worth unless the validity of the tests has been established, and it is of no consequence that the test produced a correct

---

[*] In proposing a rule of admissibility I note that various procedural safeguards should be followed to minimize the possibility of confabulation. In this regard, I observe that the procedure in this case was tainted because the victim inadvertently learned, prior to hypnosis, that defendant was a suspect. However, in view of the very strong corroborating evidence, I do not view this fact as dispositive.

result in a particular case. By contrast, the evidence at issue is a witness' identification which is presumed reliable unless some "suggestive" procedure has tainted it. Hypnosis often helps a witness recall facts accurately, but the only way to guard against the danger of confabulation is to have independent verification of the facts recalled. Because hypnosis is conceptually different from "tests" it would be appropriate to establish a different rule of law as to the admissibility of such evidence.

In enumerating the various reasons why hypnotically refreshed testimony is subject to question, the majority seems to suggest that the admissible testimony of any other witness will produce evidence clear from taint, prejudice, or simple mistaken recall. We know that such is not the case. Nor does the rule of law I propose usurp the function of the jury. The ultimate determination of weight and credibility in either case remains for the trier of the fact. The problem which I envision in the "per se" rule of the majority is that it rejects, out of hand, testimony which is reasonably likely to be as reliable as that of any other witness.

Assuming, *arguendo,* that the majority position is correct, I must further disagree with the conclusion that the subject is not incompetent as a witness to testify to her recollections prior to hypnosis. A major justification for rejecting hypnotically refreshed testimony is that the subject cannot separate pre- and posthypnotic recollections and, once hypnotized, the subject acquires great confidence in the memory thus rendering cross-examination ineffective (see *State v Mena,* 128 Ariz 226). These considerations have prompted California to declare the hypnotized witness incompetent to testify at all as to matters discussed under hypnosis (*People v Shirley,* 31 Cal 3d 18, __, *supra*).

Finally, I make several concluding observations. Hypnosis should not be used in a great many cases, particularly those in which the witness was inebriated at the time or unable to remember clearly for some other reason (see, e.g., *People v Shirley, supra*). Moreover, hypnotically refreshed testimony should not be used merely to elicit details where the victim has substantial memory of the event. The greater the detail required of the witness, the more chance

there is for confabulation and the more difficult it is to verify the recall. Lastly, the need for hypnosis most often arises in the context of a rape or other sexual assault where the victim has repressed the event because of its uniquely traumatic nature (*State v Mack,* __ Minn __, 292 NW2d 764; *State v La Mountain,* 125 Ariz 547; *Polk v State,* 48 Md App 382; *Harding v State,* 5 Md App 230, cert den 395 US 949). Generally, there are no other witnesses, and thus the need for the victim's testimony is all the more pronounced. I believe that admitting the hypnotically refreshed identification only when there is "clear and convincing" verification that the witness did not misidentify the attacker would best accommodate the competing interests of the need for the evidence with the rights of an accused.

For the reasons stated herein, I would affirm defendant's conviction.

DILLON, P. J., CALLAHAN and SCHNEPP, JJ., concur with HANCOCK, JR., J.; DOERR, J., dissents and votes to affirm in an opinion.

Judgment reversed, on the law and the facts, and a new trial granted.