OPINION OF THE COURT
Robert J. Stolarik, J.
This is a motion to suppress the testimony of two prosecution witnesses. Defendants assert that these witnesses are incompetent to testify in that they have been hypnotized for the purpose of restoring/refreshing their memory of the events in issue. (People v Shirley, 31 Cal 3d 18.) The District Attorney opposes the motion, taking the position that only the prehypnotic statements of the two witnesses are being offered and that this posture does not render the witnesses incompetent to testify as to the facts they were able to recall prior to undergoing hypnosis. (People v Hughes, 88 AD2d 17.) Defense counters with the argument that the hypnotic session had the effect of “concreting” the witnesses’ testimony, thereby rendering cross-examination ineffective and interfering with defendant’s right of confrontation under the Sixth Amendment. (People v Shirley, supra; State v Mena, 128 Ariz 226.)
*231 While the motion to suppress was first enunciated during the pretrial identification hearings (United States v Wade, 388 US 218), further argument and discussion on the propriety of a pretrial hypnosis hearing indicated to the court that the motion to suppress was intended to extend beyond the pretrial phase and into the trial itself. With this understanding, this decision will address itself not only to the testimony of the two witnesses in the pretrial hearing, but also with regard to their testimony on trial. In fact, this decision is probably more appropriate to the trial testimony in that the testimony of the two witnesses during the Wade hearings indicated that they did not participate in any identification procedure.
While there is no statutory authority for such a procedure, the court concluded that a pretrial hearing was appropriate in the circumstances and, accordingly, directed that the same be accomplished after disclosure by the prosecutor that the two witnesses involved had undergone hypnosis. It appears that a failure of disclosure in this regard might lead to preclusion (Emmett v Ricketts, 397 F Supp 1025; United States v Miller, 411 F2d 825), and it also appears that such disclosure took place in sufficient time to allow the defense to make necessary preparation. If indeed disclosure is required, the court concludes that this duty has been fulfilled.
THE FACTS
On October 20,1981, a Brinks armored car was robbed at gunpoint in the Nanuet Mall, during which episode a Brinks armored guard was shot and killed and another wounded. In furtherance of their escape, the suspects switched vehicles and proceeded to an entrance to the New York State Thru way in West Nyack at which point the vehicle in which they were traveling was stopped by police and a gun battle ensued. During the shootout, two police officers were killed, one wounded, and several arrests were made, one at the scene and others shortly thereafter. Two of the surviving police officers, Detective Arthur Keenan and Patrolman Brian Lennon, made statements later that same day, which were reduced to writing. On October 21, 1981 Detective Keenan (in an attempt to gather more detailed information of the events of the previous day) was *232 hypnotized by a retired New York State Police Officer, Joseph Czaplicki, who had both formal training and several years of experience in this area of investigation. On October 22,1982, Officer Lennon was involved in a similar procedure, for similar reasons. The hypnotic session, in both cases, was tape recorded and subsequently transcribed. (There were also taped and transcribed “pre-hypnotic” and “post-hypnotic” statements which both Keenan and Lennon made to the hypnotist.) An analysis of both officers’ initial written statements and the three statements given to the hypnotist reveal some variants and greater detail, but for all practical purposes, they are substantially the same. The only difference that might be regarded as significant is Keenan’s statement under hypnosis, where he described the passenger emerging from the vehicle stopped at the Thruway as being “Puerto Rican” or “Indian” but considering that this description does not appear in any other statement he made and in that this person was arrested at the scene, its significance (if any) pales. Considering the arrest at the scene, Keenan would have little or no reason to describe this person, and on cross-examination he indicated that he remembers making the statement under hypnosis, but has no idea why he gave such a description. It should be noted, also, that the transcript reveals no leading question on the part of the hypnotist which might have provoked such a response.
THE HEARING
The question before the court is whether the prehypnotic testimony of Detective Keenan and Officer Lennon should be admitted. The positions of both the prosecution and the defense have been defined (supra), and in an effort to clarify some of the legal controversy surrounding the subject of hypnosis in recent years and, more particularly, to answer the question before the court, an extensive pretrial hearing was conducted. The court heard the testimony of some of the foremost experts in the field of hypnosis in this country, if not in the world. In Dr. Herbert Spiegel, Dr. Theodore Barber, Dr. Martin Orne, the court had before it, men who are generally recognized as three of the four people who are “the experts” in the field of hypnosis. (The other being Dr. Richard Hilgard, who did not testify.) Dr. *233 Bernard Diamond, author of the widely quoted (and highly controversial) article, Inherent Problems in the Use of Pretrial Hypnosis On a Prospective Witness (68 Cal L Rev 313), also appeared. While Dr. Diamond is highly regarded for his work in the field of forensic psychology, he is not considered to be (and does not consider himself to be) an expert in the field of hypnosis. The People also called Dr. Martin Reiser and Dr. Helmut Relinger. Dr. Reiser (a psychologist) conducts a school which teaches law enforcement personnel the methodology involved in the hypnotic procedure and Dr. Relinger is a professor at the University of California who has done considerable work in the field of hypnosis, but has not obtained the stature of a Barber, a Spiegel, an Orne or a Hilgard. The hypnotist, Joseph Czaplicki, also testified.
The direct testimony of Dr. Spiegel and Dr. Barber involved a general discussion on the subject of hypnosis (or at least enough discussion to provide a background for the particular question before the court). Both Dr. Spiegel and Dr. Barber characterized the hypnotic state as one of increased relaxation wherein the subject is able to concentrate or focus on a particular area (or as Dr. Spiegel expressed it, getting the subject to “pay attention”). They also generally agreed that the phenomena of fantasy, increased suggestibility, concreting, confabulation and other so-called “contaminations” of the memory process (which are sometimes occasioned by the hypnotic process) are, in fact, possibilities that only occur in a small percentage of cases. They maintain that only a very small segment of the population make good hypnotic subjects (highly suggestible and given to fantasizing) and to “bias” a subject would require a deliberate effort on the part of the hypnotist. Dr. Barber was particularly emphatic on this point and decried the lack of scientific and factual basis for the opinions expressed by some so-called experts in the field (even Dr. Orne and Dr. Diamond) which opinions have been adopted in whole or in part, by some appellate courts in this country. With regard to the afore-mentioned “phenomena” they point out that they can (and do) occur with subjects who have not been hypnotized, and in answer to the objection that in the case of a hypnotized subject these *234 phenomena cannot be identified, they argue that in most cases, the hypnotic subject has not been biased and, in any event, the process of cross-examination is available to explore the possible influence of the hypnotic process on a witness. They stated that the hypnotic process is a legitimate means of increasing recall in some cases and the hypnotic induction process merely accomplishes this potential in a shorter time than it might take normally. They answer the objection to the admissibility of prehypnotic testimony (i.e., the deprivation of the opportunity of meaningful cross-examination by hypnotically induced “concreting” of the witness’ recall) by pointing out again, that this phenomenon rarely occurs and if it does, it only occurs with a highly suggestible subject and where there has been a deliberate attempt to impose the “concreting” process on the subject. (They also emphasized that concreting can occur in witnesses who have not been hypnotized, sometimes by the simple process of repetition.)
By way of rebuttal, Dr. Martin Orne appeared for the defense. He testified almost exclusively in the area of the effect of hypnosis on cross-examination and stated that the memory “validating” effect of hypnosis deprived a cross-examiner of the opportunity to effectively and meaningfully cross-examine a witness who has been hypnotized. He was rather explicit in this opinion, indicating that the reliving of an experience by the subject “concreted” the memory, contributing to an unshakability on the part of the witness, thereby rendering him invulnerable to cross-examination. Interestingly, he agreed with Dr. Spiegel’s thesis that the witness who has been hypnotized is best able to be cross-examined, but qualifies this opinion with the proviso that this would be true only if the memory obtained were accurate, and there is no way of knowing if it is. (It is worthy of note that this qualification apparently only applies where there is an “obtained memory.” He gives no opinion regarding the situation where no new information is obtained under hypnosis, except to say that it makes no difference in that the hypnotic experience would “concrete” the witness’ prehypnotic memory, thereby making cross-examination ineffective.) He also indicated that the “ceremony” of the hypnotic procedure is *235 not a definition of hypnosis, in that sometimes it simply does not work and agreed with Dr. Spiegel and Dr. Barber that there were degrees of hypnotizability that varied from subject to subject. He also concurred with Dr. Spiegel and Dr. Barber in his opinion that while the hypnotic state might heighten suggestibility, it did not create a state of compliance or gullibility on the part of the subject, nor one of complete control on the part of the hypnotist. But he did describe the possible side effects of hypnosis in more positive terms than Spiegel and Barber, speaking of confabulation, fantasy and concreting in terms of the norm, rather than the unusual or the exceptional circumstance.
Dr. Barber was recalled to rebut Dr. Orne’s testimony and a new witness, Dr. Helmut Relinger, also appeared in this role. Dr. Barber stated that there was no data to support Dr. Orne’s theory of “concreting,” citing three studies: Putnam,[1] Zelig and Beidelman,[2] and Sheehan and Tilden[3] to support his thesis. These studies (with some variations) contrasted the experiences of witnesses (some of whom were hypnotized) when subjected to leading questions and compared their answers and the relative degrees of confidence they had in their answers. While there was some variance regarding the answers given, there was little or no difference in the level of confidence displayed. Dr. Relinger discussed these same three studies, plus two more (the Howard Timm[4] study and the Sanders-Simmons study).[5] He expressed the opinion that these studies did not support Dr. Orne’s theory on “concreting” and agreed with Dr. Barber that hypnosis does not increase certitude in memory and, consequently, would not destroy the effectiveness of cross-examination.
*236 Dr. Bernard Diamond appeared on behalf of the defense in surrebuttal. He stated that in his opinion, hypnosis increased certitude, therefore interfering with the cross-examination process, and that there was no way of telling if a witness’ recall had been contaminated. He indicated that he had not used hypnosis since 1968, and had conducted no laboratory experiments to support his conclusions (confirming what other witnesses had already stated) but based this entire thesis on hypnosis on his' “clinical experience” and the writings of others.
HISTORY
Hypnosis has enjoyed a rather checkered and uneven history. First utilized in the late 1700’s by Franz Anton Mesmer and later by Jean Hardin Charcot and Sigmund Freud and it was used intermittently by various practitioners in psychological treatment. It fell into some disrepute, however, and for many years was relegated to a kind of scientific limbo. In recent years, it has come again into popular use in psychiatric treatment and, even more recently, in the field of investigation and, coincidentally, has been the subject of increased experimental attention in the scientific community. It is in this latter area that the question of the admissibility of hypnotically induced testimony[6] has been litigated somewhat extensively in other jurisdictions both on the Federal and State levels. (Somewhat surprisingly, however, the question has only been addressed on the appellate level in New York in People v Hughes, 88 AD2d 17, supra.) The majority of these courts have held hypnotically induced testimony to be admissible, reasoning that the hypnotic process should be considered in terms of weight (as opposed to admissibility) and that cross-examination would enable a jury to measure the effect of hypnosis on the credibility of the witness. This rationale, sometimes referred to as the evidentiary rule, has been adopted in the Federal courts with no exception. (United States v Adams, 581 F2d 193, cert den 439 US 1006; United States v Awkard, 597 F2d 667, cert den 444 US 885; United States v Miller, 411 F2d 825; United States *237 v Narciso, 446 F Supp 252; Wyller v Fairchild Hiller Corp., 503 F2d 506; Kline v Ford Motor Co., 523 F2d 1067.)
On the State level, a similar approach has been adopted in many jurisdictions. (See Chapman v State, 638 P2d 1280 [Wyo]; Clark v State, 379 So 2d 372 [Fla]; People v Smrekar, 68 Ill App 3d 379; State v McQueen, 295 NC 96; Creamer v State, 232 Ga 136; State v Jorgensen, 8 Ore App 1; Pearson v Indiana, _Ind_, 441 NE2d 468; State v Beachum, 97 NM 682; State v Wren, Supreme Ct, slip opn, Jan. 10, 1983 [La]; Collier v State, 244 Ga 553; State v Greer, 609 SW2d 423 [Mo].)
More recently, another approach has been adopted in several jurisdictions which holds to the theory that hypnosis is so scientifically unreliable that a court must exclude hypnotically induced testimony unless and until the procedure gains greater acceptance in the scientific community (applying the test of Frye v United States, 293 F 1013). The adherents to this school of thought have surfaced in several jurisdictions in recent years. (See People v Shirley, 31 Cal 3d 18, supra; State v Mena, 128 Ariz 226, supra; Commonwealth v Nazarovitch, 496 Pa 97; Polk v State, 48 Md App 382; People v Tait, 99 Mich App 19; People v Blair, 25 Cal 3d 640; People v Hangsleben, 86 Mich App 718; Greenfield v Robinson, 413 F Supp 1113; Rodriguez v State, 327 So 2d 903 [Fla]; Jones v State, 542 P2d 1316 [Okla]; Emmett v State, 232 Ga 110; State v Pierce, 263 SC 23; Greenfield v Commonwealth, 214 Va 710; People v Harper, 111 Ill App 2d 204; State v Harris, 241 Ore 224; People v Hughes, 88 AD2d 17, supra.)
Perhaps it would be appropriate to note at this juncture that State v Shirley (supra) has gone a step further than merely excluding the hypnotically induced statement. Adopting, in toto, the rationale of Dr. Bernard Diamond, California would declare a witness incompetent to testify as to any fact in issue, once he has been hypnotized, on the theory that once a witness has been hypnotized, there is no way of knowing how the hypnotic process has affected his memory, thereby rendering that witness’ testimony totally unreliable. This view has gained little support beyond Dr. Diamond and the California Supreme Court.
Still another approach is that adopted by the State of New Jersey in State v Hurd (86 NJ 525). (See, also, People v *238 Lewis, 103 Misc 2d 881; People v Lucas, 107 Misc 2d 231; People v McDowell, 103 Misc 2d 831.) These courts have adopted certain safeguards which are designed to minimize the dangers of suggestibility, confabulation, fantasy, bias and other so-called “contaminations” inherent to the hypnotic process. Admissibility of the hypnotically induced testimony is dependent upon satisfactory adherence tu these requirements. Dr. Martin Orne was the first to promulgate a set of these safeguards and they were adopted by the Hurd court and enlarged upon in People v Lewis (supra). Dr. Orne proposes that the following requirements would properly safeguard the hypnotic process against possible taint:
“First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session * * *
“Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense * * *
“Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or another suitable form * * *
“Fourth, before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them * * *
“Fifth, all contacts between the hypnotist and the subject must be recorded. The use of videotape, the only effective record of visual cues, is strongly encouraged but not mandatory.
“Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including a pre-hypnotic testing and the post-hypnotic interview.”
The additional safeguards espoused in Lewis would require a prehypnosis psychological examination, consideration of corroborative/contradictory statements and, also, an admonishment to the hypnotist to avoid “cueing” during the hypnotic process. This middle-of-the-road approach suggests a consideration of all the circumstances attendant to the hypnotic procedure on a case-by-case basis and further suggests that to adopt a rigid posture for or against admis *239 sibility is to ignore the diversity and complexity of situations involving hypnosis. These safeguards also suggest that the hazards of hypnosis can be minimized to the point where testimony which has been refreshed by hypnosis can be deemed reliable, and therefore admissible.
While there is a diversity of opinion exhibited in these various approaches to the question, there seems to be a common recognition of the possible dangers inherent in the hypnotic process and each line of cases suggests some requirement of reliability. Further analysis indicates that the test for reliability should be applied to the process by which memory was obtained, i.e., the hypnotic process itself. This is precisely where the controversy lies: whether the product of hypnosis is real memory or pseudo-memory. The proponents of the Frye rule hold to the theory that hypnosis is a scientific procedure and, as such, not only should be subjected to the scrutiny of the scientific community, but should also be generally accepted by that community before the product of the procedure is admissible. They maintain that by reason of the controversy surrounding the subject of hypnosis, that hypnosis has not yet reached this level of acceptability in the scientific community. On the other hand, Dr. Barber and Dr. Spiegel maintain that hypnosis has been brought out into the sunlight in recent years, and much of the aura of mystery that has surrounded it has been removed. They point out (except in rare cases) that the prehypnotic and hypnotic memory of a witness are identifiable by that witness and, accordingly, effective cross-examination is not precluded. They maintain that all of the possible pitfalls of hypnosis (fantasizing, suggestibility, confabulation, concreting, etc.) can also occur in a nonhypnotized subject and, therefore, lose much of their impact as arguments against hypnosis. They also claim that hypnosis, when used as a possible memory “refresher” or memory “retriever”, is simply a procedure which asks a subject to concentrate (or “pay attention”) better by getting the subject in a more relaxed state. They hold to the proposition that there is nothing mystical about the process, that the afore-mentioned dangers of hypnosis are not the usual expectation, but only become real when there is a deliberate attempt to bias an already highly *240 suggestible subject. Moreover, they indicate that when such an attempt is made, it is possible to identify. They do maintain, however, that their thesis is supportable only if the integrity of the hypnotic procedure is preserved. Hurd (supra) and its progeny have attempted to formalize this “preservation” process and set forth safeguards which purport to insulate the procedure from contamination.
Clearly, in determining the admissibility of hypnotically induced statements, there must be some test of reliability which answers the question of whether the hypnotic process can be relied upon to produce recall that is not only real, but amenable to cross-examination. Whether this test be the Frye test, the Hurd safeguards, or the ultimate test of effective cross-examination (which really presupposes that the memory obtained is real, not a pseudo-memory) is currently in dispute. It is also apparent that, until such time as there is some unanimity in the scientific community, the Frye test is the appropriate attitude for the courts to adopt with regard to hypnotically induced testimony. In time, the scientific community might reach a consensus on this question, but until that time occurs, the only arguably responsible position is one of forbearance.
This forbearance might also be well exercised by prosecutors, law enforcement personnel, and even defense counsel. Until such time as the question is resolved, hypnosis ■ should be used selectively and sparingly, and only after careful consideration of all of the legal problems involved.
THE QUESTION
With regard to the question before the court (the admissibility of a prehypnotic statement), the law has been somewhat slower evolving, but a body of case law seems to be building which sanctions the admissibility of the prehypnotic recall. Indeed, several jurisdictions which bar the hypnotically induced statement, allow a witness to testify to facts capable of recall prior to undergoing hypnosis. (People v Hughes, 88 AD2d 17, supra; Arizona ex rel. Collins v Superior Ct., 132 Ariz 180; State v Koehler, 312 NW2d 108 [Minn]; People v Wallach, 110 Mich App 37.)
Considering the intrusion of the hypnotic process, it might seem that the admissibility of the prehypnotic state *241 ment in jurisdictions which preclude the admission of the hypnotically induced statement is contradictory. But even considering for the sake of argument that some test of reliability is properly applied, it is apparent that there is a different focus in the case of the prehypnotic statement and, consequently, a different logic should be utilized. In applying, for example, the Frye test to the hypnotically induced statement, the obtained memory is considered questionable because the procedure used to produce this recall is considered to be questionable. Using a similar application in the case of the prehypnotic statement, however, yields an entirely different result. The testimony cannot be considered unreliable because of an unreliable method of production. Hypnosis is not used to produce the testimony, the testimony is the product of the witness’ substantive memory, and whether that memory is accurate and/or untainted, would seem to be a question for a jury, and to deny its admissibility, would be to usurp the jury’s function. The admissibility of the prehypnotic statement survives the test of sound legal reasoning. To deny the admissibility of such a statement because of a claimed interference with cross-examination is “putting the cart before the horse.” Certainly, if the record of a pretrial hearing revealed evidence of concreting or other procedural impropriety in the hypnotic process, the court could make an appropriate ruling. But to bar admissibility on the mere suggestion that the witness’ prehypnotic recall might have been concreted, not only is legally illogical, but it is to beg the question. Indeed, even if the phenomenon of “concreting” is shown to be present, the jury could consider this factor together with all of the other criteria for evaluating testimony. In the instant case, the court is also persuaded by the record. Dr. Relinger’s and Dr. Barber’s testimony regarding five separate experiments which conclude that the hypnotic process does not ordinarily lend itself to concreting is most persuasive on the issue and the data produced by Dr. Barber and Dr. Relinger indicate that concreting is not a common and usual by-product of hypnosis. Additionally, the court finds that in this particular case, considering all of the facts and circumstances of the hypnotic procedures involving Keenan and Lennon, that *242 there is no showing of concreting. They were subjected to extensive cross-examination, were able to identify what they said before and during hypnosis, and gave no indication that they were “frozen” into any particular version of the facts they were relating. The court also finds that based on the transcripts of the hypnotic interviews, and the testimony of Dr. Spiegel, that there was no attempt on the part of the hypnotist to bias the subject by leading or by suggestion, nor was there any evidence of an attempt to implant posthypnotic suggestion, and that Keenan and Lennon were not highly suggestible subjects. The court concludes that there are no substantial or consequential differences in the prehypnotic, hypnotic and posthypnotic statements of the witnesses Keenan and Lennon and that the effects of the hypnotic process were nonexistent, or so insignificant as not to be discernible. Accordingly, the court denies the motion to declare the witnesses incompetent to testify (adopting the rule of the Shirley court) in these particular circumstances. We find no procedural excess in any phase of the hypnotic process and, further, find that both witnesses were able to be effectively cross-examined. Applying this same rationale, there might be some situations in which a witness might be totally (indeed, properly) disqualified from testifying, but in the circumstances before the court, we find no basis for such disqualification.

. Putnam, Hypnosis and Distortions in Eyewitness Memory, 27 International Journal of Clinical and Experimental Hypnosis, No. 4, p 437.

. Zelig and Beidelman, The Investigative Use of Hypnosis: A Word of Caution, 29 International Journal of Clinical and Experimental Hypnosis, No. 4, pp 401-412.

. Sheehan and Tilden, Effects of Suggestibility and Hypnosis on Accurate and Distorted Retrieval from Memory.

. An Empirical Examination of the Effects of Forensic Hypnosis, presented at Ninth International Congress of Hypnosis and Psychomatic Medicine, Glasgow, Scotland.

. Sanders and Simmons, The Use of Hypnosis to Enhance Eyewitness’ Accuracy: Does it Work? Journal of Applied Psychology, 1982.

. For the purpose of this decision, the term “hypnotically induced” will refer to testimony which- is initially gathered during the hypnotic process.