OPINION OF THE COURT
Edward C. Alfano, J.
The defendant has been indicted for the crimes of attempted murder in the first degree, assault in the first degree, assault in the second degree, aggravated assault upon a peace officer, criminal possession of a weapon in the second degree and two counts of criminal use of a firearm in the first degree.
*76 The defendant moves for an order precluding the testimony of Police Officer Dominick Martino, who was hypnotized after the event in an effort to enhance his recollection. The defendant further moves to suppress all statements made by him in Florida to law enforcement personnel on the ground that, under case law, they were illegally obtained and were involuntary within the meaning of CPL 60.45.
A hearing on the defense motion was held before this court on March 22, 23, April 29, and May 10, 1983. The People called as witnesses Mr. Vivian Chembo, Detective Robert Gadson, Detective Ray Apo, Police Officer Dominick Martino, Police Officer Thomas Kennedy, Detective Milagro Markman and Detective Steve Sessler. The defendant called no witnesses.
FINDINGS OF FACT
At approximately 2:00 p.m. on October 8, 1981, Police Officers Kennedy and Martino were on radio motor patrol in the County of Kings. At the intersection of East 93rd Street and Rutland Road, they paused to investigate double parked cars in front of a suspected “smoke shop”. Officer Kennedy then observed the defendant exit the “smoke shop” counting money in his hand. Defendant looked up at Police Officer Kennedy and began to run. Defendant fled around a corner. When Police Officer Kennedy turned the corner the defendant, crouched between parked cars, fired five shots at Officer Kennedy, wounding him five times.
After Officer Kennedy was taken to Kings County Hospital, Police Officer Martino proceeded to the 67th Precinct, where he examined photographs and selected as the perpetrator a man who was not the defendant.
Mr. Vivian Chembo, an employee of a garage adjacent to the scene, heard the shots. Mr. Chembo went out and saw Officer Kennedy lying on the ground. He also saw defendant, whom he knew for over two years, walking away fast from the scene and looking back.
At approximately 11:00 a.m. on October 9, 1981, Officer Martino accompanied Detective Calabro to the hypnosis unit of the Special Investigation Section of the New York *77 City Police Department. Both officers were received by Detective Markman of the hypnosis unit. Detective Mark-man gave Officer Martino a pamphlet on hypnosis to read while she spoke privately to Detective Calabro. Detective Calabro furnished Detective Markman with skeletal facts concerning the case and Detective Calabro expressed the hope that submitting Officer Martino to hypnosis would result in an enhanced recall of the perpetrator and vehicles involved in the shooting.
Officer Martino was then led by Detective Markman into a 10-foot square studio containing a reclining chair, a one-way mirror and a reel-to-reel audio tape recorder. Detective Markman and Officer Martino were alone in the studio. Detective Markman then executed the following four-stage procedure: Firstly, Detective Markman explained hypnosis in general and the induction technique in particular. Secondly, she had Officer Martino make a prehypnotic audio-recorded statement of the event. Thirdly, she applied a relaxation technique, induced hypnosis and questioned him. The questions and answers were taped on the audio tape recorder. Officer Martino’s eyes were closed during this session and at one point, Detective Markman touched Officer Martino’s wrist lightly. Fourthly, Detective Markman brought Officer Martino out of the hypnotic state and reviewed the statements with him. There were only insignificant differences between Officer Martino’s prehypnotic and hypnotically enhanced statements.
The next day, October 10, 1981, Officer Martino was shown 10-12 photographs. He selected the photograph of the defendant and identified him as the perpetrator.
A warrant for the arrest of the defendant was issued and forwarded to the Police Department in Dade County, Florida, where Detective Sessler took charge of the case.
On February 5, 1982, Detective Sessler received information to the effect that the defendant was residing at 184-10 N.W. 21st Avenue, Miami, whereupon Detective Sessler, together with Sergeant Rivers, also of the Dade County Police and several FBI agents, proceeded to that location.
*78 The police entered said premises and found the defendant hiding in an attic. The defendant was taken into custody at which time Detective Sessler read the Miranda warnings in full to the defendant. The defendant indicated that he understood these rights but did not wish an attorney. Defendant was then questioned about the shooting and defendant stated, “I shot the officer because I was scared”.
The defendant was immediately placed in a police vehicle, together with Detective Sessler and Sergeant Rivers, and taken to police headquarters. En route, the defendant, without being questioned, initiated a discussion and inquired whether the New York Police would come to Miami. Detective Sessler said he suspected so and then the defendant said, “I have been down on weapons before and I shot the officer five times. I didn’t want to go to jail. I came to Miami in late October.”
The defendant was thereafter incarcerated and extradited to New York.

hypnosis/pee-hughes

Beginning with the early case of People v Ebanks (117 Cal 652), the courts have generally placed hypnotically induced recollection in the same category as the statements made after administering truth serum and statements made during polygraph tests. As a result, the courts have refused to allow testimony of such recollection into evidence.
An additional controversy with respect to the admissibility of hypnotically induced testimony centered upon the applicability of the “Frye rule”. That rule, first stated in Frye v United States (293 F 1013), provides that evidence of a scientific nature will be admitted at trial only if the procedure used is generally accepted in the scientific community.
Another aspect of the hypnosis controversy has arisen in recent cases, including the case at bar, in which hypnosis has been utilized to refresh or restore the memory of a witness who has been traumatized. The evidence offered in these cases is the witness’ present recollection which has been “refreshed” by a pretrial hypnotic session. Jurisdictions other than New York have accepted the hypnosis *79 procedure as another method of refreshing recollection. The Court of Appeals of Maryland held that the use of this procedure affected only the weight of the evidence and not its admissibility (Harding v State, 5 Md App 230, cert den 395 US 949). However, the same court thereafter reversed itself after its adoption of the Frye rule (Polk v State, 48 Md App 382).
Although the original concepts of Harding (supra) are still followed in a majority of jurisdictions despite the reversal, many courts considering the problem for the first time are applying the Frye test with varying results.
New Jersey’s highest court has attempted to minimize the risk of suggestibility by imposing minimum guidelines (State v Hurd, 86 NJ 525).
The Hurd guidelines are:
Firstly, a psychologist or psychiatrist trained in the field of hypnosis must conduct the session. ,-i
Secondly, the professional utilized should be independent and not employed by the police authorities.
Thirdly, information acquired during the hypnosis session should be recorded.
Fourthly, a prehypnotic statement should be obtained by the hypnotist.
Fifthly, the use of video tape is encouraged, but not required.
Sixthly, only the subject and the hypnotist should be present during the prehypnotic and hypnotic session.
Nevertheless, many courts have refused to accept hypnotically refreshed recollection on the grounds that the technique fails the Frye test, and that the Hurd guidelines are ineffective. These courts, however, have permitted a witness to testify as to events recalled prior to hypnosis. These States have noted the deleterious and impermissible effects generated by hypnosis, including confabulation and fabrication (People v Gonzales, 108 Mich App 145; Commonwealth v Nazarovitch, 496 Pa 97; State v Palmer, 210 Neb 206).
Another view followed only by California is that a witness who has been hypnotized becomes incompetent to *80 testify on the basis that even after excluding the posthypnotic recollections, the witness will have attained added confidence (concreting) which would hinder effective cross-examination (People v Shirley, 31 Cal 3d 18).
A middle position has been adopted by those States which, in rejecting Frye and Harding (supra) in determining admissibility of hypnotically enhanced statements, have taken a case-by-case approach focusing on the extent, if any, of the suggestibility of the prehypnotic session as well as the reliability of the recollections under the totality of circumstances (State v Armstrong, 110 Wis 2d 555).

People v Hughes

The case of People v Hughes (59 NY2d 523) commenced its landmark voyage through the stormy sea of hypnosis controversy when the trial court allowed a rape victim to testify that the defendant was her attacker although the evidence disclosed that prior to being hypnotized, she had been unable to remember what had happened or who had raped her and that only after being hypnotized was she able to recall the identity of her assailant.
After conducting a hearing, the trial court concluded that the People had shown by clear and convincing evidence that the hypnosis procedures used were not impermissibly suggestive and allowed the victim to testify.
After conviction, the Appellate Division (88 AD2d 17) reversed and held that
“[i]f and when hypnosis becomes generally accepted in the scientific community as a reliable method of restoring memory, testimony based on hypnotic recall should in a proper case be admitted. The jury, not the court, should then determine whether such testimony is worthy of belief. Until then, it should be excluded.
“Although on a retrial the testimony produced through hypnosis must be excluded, it does not follow that because she [the witness] has been hypnotized [the witness] is incompetent to testify to facts which she was able to recall prior to going under hypnosis” (p 22).
The Court of Appeals in its historic decision (People v Hughes, supra) affirmed the Appellate Division and noted *81 that the use of hypnosis in criminal investigations produces at best mixed results and the suitability of utilizing hypnotically enhanced results in legal proceedings has not been indorsed by scientific experts.
The court further recognized that a hypnotic subject will be affected to some degree in these ways. First, the subject may become increasingly susceptible to suggestions made by the hypnotist. The place at which the procedure is conducted may also affect the outcome. Second, a subject may himself confabulate or intentionally fabricate. Third, a person who has recalled an incident under hypnosis may experience an increased confidence in his subsequent recollection of that incident.
Judge Wachtler, in holding that hypnosis is not comparable to other methods of refreshing recollection long accepted in common law, observed that “[w]hat distinguishes hypnosis is * * * that suggestion is an essential and inseparable part of the process * * * [I]t is a scientific process and [its results are] scientific results” (People v Hughes, supra, p 543). Judge Wachtler further noted that hypnosis has not achieved the status of general acceptance in the scientific community and that the process may contain the unacceptable mixture of accurate recall, fantasy, and pure fabrication.
The Court of Appeals adopted the view that while hypnotically induced recollection was inadmissible, the pretrial use of hypnosis does not necessarily render a prospective witness incompetent since in some instances there may be little or no hindrance to satisfactory cross-examination. However, in order to establish whether or not a prospective witness would be competent to testify, the Court of Appeals charged the trial courts with determining two issues at a pretrial hearing: First, the extent of a witness’ prehypnotic recollection and, second, whether the hypnosis procedure was so impermissibly suggestive as to require exclusion of in-court testimony with respect to prehypnotic recollections. The court also required that at the pretrial hearing, detailed proof be introduced as to measures taken to reduce the risk of impermissible suggestiveness. The court declined to require implementation of the Hurd guidelines. However, it held that they may be deemed to be pertinent in a particular case.
*82 Judge Wachtler clearly outlined the burden of proof at such a pretrial hearing in stating that the “People should assume the burden of demonstrating by clear and convincing proof that the testimony of the witness as to his or her prehypnotic recollection will be reliable and that there has been no substantial impairment of the defendant’s [ability to cross-examine]” (People u Hughes, supra, p 547).
impact of Hughes on the case at bar
The People concede the applicability of Hughes (supra) and acknowledge that they have the burden of showing by clear and convincing proof the reliability of the proffered testimony of Police Officer Martino. The People contend that the reliability of Officer Martino’s testimony is established by the transcript of the tapes of his prehypnotic recollection. The People also point out that Hughes does not mandate implementation of the Hurd guidelines. However, this court interprets Hughes as granting wide latitude to the trial court in determining the quantum and quality of proof required at the pretrial hearing in order to establish the clear and convincing evidence required by Hughes. The Court of Appeals noted “[experience and determination on a case-by-case basis will be required before procedural [guidelines] can be properly enunciated”. (People v Hughes, supra, p 547.)
This court determines that in the case at bar, the Hurd guidelines are indeed pertinent and compliance therewith would serve to aid the court in determining the extent of taint, if any, in Officer Martino’s proposed testimony. A review of these guidelines reveal that in the case at bar, the People have failed to adhere to these precepts. First, the hypnotic session was conducted by Detective Mark-man, who, while qualified as a technician, was neither a psychiatrist nor a psychologist trained in hypnosis. Moreover, cross-examination during the hearing revealed that she did not understand the meaning of concreting or confabulation, which are basic concepts in the field of hypnosis. Second, it is clear that Detective Markman was not independent of but was in fact employed by the police department. Third, the requirement that statements obtained during hypnosis be recorded, was only partially satisfied. In view of the embryonic state of knowledge of the effects of *83 hypnosis and the concern expressed by the Court of Appeals, this court is of the view that if the hypnotic technique is employed, video recording and not merely audio should be used. The court notes that the District Attorney regularly employs video tape with respect to statements made by defendants. The court further observes that Detective Markman, in her testimony, stated that she touched Officer Martino’s wrist. Without the. benefit of video recording, this court cannot properly evaluate the effect of this physical contact.
However, the People have complied with those Hurd guidelines requiring a detailed prehypnotic statement, the recording of all contacts between subject and the hypnotist, and the presence of only the hypnotist and the subject during the session.
The People emphasize that Officer Martino’s prehypnotic and hypnotically enhanced statements differ very slightly and they analogize the instant case to People v Smith (117 Misc 2d 737) in which Judge Rosenblatt permitted statements to be admitted when he found no marked difference between prehypnotic and posthypnotic statements and that the hypnotic technique was satisfactory and not leading in nature.
The People, by their analogy, have failed to understand the primary issue facing the court in the discharge of its Hughes mandate in the case at bar, namely, the possible impairment of defendant’s ability to effectively cross-examine. The District Attorney relies upon the Hughes observation that in some cases where a witness, prior to hypnosis, was confident in his recollections, there may be little impairment of the power to cross-examine after hypnosis. The court notes that Officer Martino had, prior to hypnosis, identified the perpetrator as someone other than the defendant. It was only after hypnosis that he identified the defendant from a photograph. The court has reviewed the dangers of hypnosis, as outlined by the Court of Appeals, and concludes, after considering the credible evidence, that without the testimony of a psychiatrist or psychologist with expertise in hypnosis, it cannot determine whether the testimony of Officer Martino has been rendered incompetent by concreting, confabulation, fabrication, or any other hypnotically induced impairment.
*84 This raises the question of the need for expert testimony. The District Attorney correctly notes that the Court of Appeals does not require the presentation of expert testimony. However, this court determines that in the case at bar where the hypnotic session was not videotaped, where the prospective witness had previously made contradictory identifications and where two and possibly three Hurd guidelines were not met, the assistance of some expert testimony was required to properly discharge the Hughes mandate. The court, during and after the close of the hearing, offered the People numerous opportunities to present some expert testimony, but the People declined to do so. For the reasons discussed, and in light of this court’s interpretation of the Hughes case, the court finds that the People have failed to sustain their burden of establishing the reliability of the testimony of Police Officer Martino by clear and convincing proof.
defendant’s statements made in
FLORIDA — CONFLICT OF LAWS
Defendant, having moved to suppress statements made in Florida to Florida law enforcement personnel, the court determines that a threshold conflict of laws question exists.
The question to be determined is whether a confession received in violation of New York law must be suppressed even where such confession did not violate the law of the State in which it was made.
Under applicable New York law, the right to counsel attaches upon the commencement of a criminal action (People v Samuels, 49 NY2d 218). In the instant case, it is clear that a criminal action had commenced with the filing of an accusatory instrument in New York before defendant made his confession. (CPL 1.20, subd 17.) Thus, absent a waiver in the presence of his attorney of his right to counsel, defendant could not be interrogated without having his attorney present (People v Settles, 46 NY2d 154; People v Samuels, supra; People v Cunningham, 49 NY2d 203).
Under applicable Florida law, the right to counsel attaches at every critical stage of a felony prosecution (Montgomery v State, 176 So 2d 331 [Fla], cert den 384 US 1023; *85 Myrick v State, 177 So 2d 845, 849 [Fla]). However, in Florida, a defendant may waive his right to counsel after such right is asserted, but prior to consultation with his attorney (Cribbs v State, 378 So 2d 316 [Fla]).
Since such a critical distinction exists between the laws of New York and Florida, the court must determine which law to apply. In both civil law (Intercontinental Planning v Daystrom, Inc., 24 NY2d 372) and criminal law (People v Benson, 88 AD2d 229), New York has adopted an “interest analysis” approach in determining which law to apply (see, also, Burge v State, 443 SW2d 720 [Tex]; People v Saiken, 49 Ill 2d 504 [other jurisdictions also adopting “interest analysis”]). In People v Benson (supra), New York police obtained a statement (not electronically recorded) from defendant while both were in Texas. Because of a requirement in Texas law that all such statements be electronically recorded, defendant contended that they were inadmissible in New York. The trial court applying an “interest analysis” approach admitted the statements holding that New York had a paramount interest in applying its own laws on admissibility (see People v Graham, 90 Misc 2d 1019, mod 69 AD2d 544, lv to app den 48 NY2d 980, reconsideration den 49 NY2d 804 [use of “interest analysis” to reject suppression]). In People v Goodrich (108 Misc 2d 326), a defendant confessed in Florida to Florida police officials after a criminal action had commenced in New York State. In Florida, the defendant was given his Miranda warnings and intelligently attempted to waive his rights. Nevertheless, the court held that under New York law (People v Samuels, supra), defendant’s right to counsel had attached and could not be waived in the absence of counsel. Accordingly, the statements were suppressed. In a somewhat similar case, People v Couch (74 AD2d 582), the same result was achieved. In Couch, the defendant after posting bail and retaining counsel failed to appear at the criminal proceedings and a bench warrant was issued. Ten months later, defendant was taken into custody by Federal authorities in Virginia on an unrelated charge. After being given his Miranda warnings by the Federal agents, defendant was questioned concerning the pending New York charges and made some inculpatory *86 statements. At the New York trial, these statements were admitted and defendant was convicted. In reversing defendant’s conviction, the Appellate Division found that defendant had retained counsel before interrogation by the Federal agents and that any waiver made in the absence of his attorney would be ineffective. Accordingly, the court suppressed the statements made. In view of the cases outlined above, this court determines that New York law is applicable to the instant motion.
NEW YORK LAW WITH RESPECT TO SUPPRESSION OF FLORIDA STATEMENTS
The People concede that any statements made by this defendant to Florida police during custodial interrogation in the house after .being arrested are not admissible, since with the filing of a criminal complaint in New York the right to counsel attached and could not be waived in the absence of counsel.
The issue before the court, therefore, is the admissibility of the additional statement made by defendant to the Florida police while being transported to the station house in the police vehicle.
The People rely upon the principle of spontaneous declarations as constituting an exception to the rule in Samuels (supra). (People v Maerling, 46 NY2d 289.) The District Attorney notes that defendant initiated the conversation in the vehicle (citing People v Lynes, 49 NY2d 286). The People contend that the statement of defendant was not “triggered by police [contact] which should reasonably have been anticipated to [effect] a declaration from defendant” (People v Lynes, supra, p 289). The People distinguish the instant case from People v Garofolo (46 NY2d 592) where an officer initiated a conversation, and refer to People v Rogers (48 NY2d 767), in which the Court of Appeals held that a statement will not be precluded as nonspontaneous simply because it followed a period of illegal questioning conducted at some prior time. The People especially dispute defendant’s contention that United States v Bayer (331 US 532), which enunciated the “cat out of the bag” theory perpetually disabled the confessor from making a valid confession after the illegal conditions have dissipated. The crime in the case at bar was *87 committed in New York and the trial will be held here. Clearly, all of the paramount interests lie in New York. Applying an “interest analysis,” it becomes clear that the laws of New York as opposed to those of Florida would govern.
The key issue before the court is the question of the attenuation of the taint of the earlier illegal interrogation with respect to the statement made later in the police car.
The United States Court of Appeals for the Fifth Circuit has held that where, during the same day, a defendant reiterated to an FBI agent what he had confessed twice that day to local authorities and where the warnings by local authorities were inadequate, the effects of the earlier invalid interrogation by the local authorities were not dissipated despite the adequate warnings given by the FBI agents (Harney v United States, 407 F2d 586).
If the intervention of several hours was insufficient in the Harney (supra) case to dissipate taint, how much more so in the case at bar where there was virtually no time lapse between the in-house invalid interrogation and the purported spontaneous statements in the police car. The Court of Appeals has stated the rule for spontaneity in People v Maerling (supra), when it held that spontaneity must be genuine and not the result of provocation, encouragement or acquiescence no matter how subtly employed.
Judge Fuchsberg in People v Chapple (38 NY2d 112) noted that where statements were obtained as part of a continuous chain of events, which chain commenced with initial illegal police conduct, that conduct would permeate the entire series of events with taint, thus rendering those statements inadmissible.
This court concludes that Detective Sessler, having taken the first statement in the house illegally (in violation of the People v Samuels rule), was on notice that defendant was prone to make statements and that defendant was concerned about the New York police.
Detective Sessler should not have answered defendant’s question in the police car relating to the expected arrival of the New York police. The officer must have known that his would evoke additional statements by the defendant. Nevertheless, in contravention of People v Maerling (supra), *88 Detective Sessler allowed the defendant to make the second inculpatory statement.
The court in the case at bar views the defendant’s second statement as an immediate and direct consequence of the initial police violation of defendant’s right to counsel pursuant to People v Samuels (supra).
For the reasons enunciated, the court holds that as to the second statement, the People have not demonstrated genuine spontaneity and/or dissipation of taint.
CONCLUSIONS OF LAW
The court makes the following conclusions of law:
1. The People have failed to sustain their burden of demonstrating by clear and convincing proof that the testimony of Officer Martino as to his prehypnotic recollection will be reliable and/or that there has been no substantial impairment of the defendant’s ability to effectively cross-examine him. The facts of this case require some testimony by a psychiatrist or a psychologist expert in the field of hypnosis to enable the court to make the psychological evaluations of Officer Martino’s testimony. The refusal of the People, despite numerous opportunities, to present even minimal expert testimony, was a serious failure on the People’s part.
2. The first statement made by the defendant to Detective Sessler in Florida is violative of defendant’s right to counsel pursuant to People v Samuels (supra). The court determines that New York law is applicable to the instant motion.
3. The statement made by defendant in the police vehicle in Florida was not genuinely spontaneous as defined in case law, but was the result of a continuous chain of events commencing with unconstitutional police conduct and terminating with unattenuated original taint.
DECISION
Therefore, it is the decision of the court that:
1. The motion of defendant to exclude the testimony of Officer Martino in its entirety is granted, and
2. The defendant’s motion to suppress all of the statements made by defendant to law enforcement personnel in Florida is granted.
*89 The foregoing constitutes the opinion, decision and order of the court.