COMMONWEALTH *vs.* DAVID P. STETSON, JR.

Norfolk.   September 15, 1981. — November 9, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law*, Public trial.  *Practice, Criminal*, Public trial, Conduct of prosecutor, Severance.  *Hypnosis.  Evidence*, Hypnotically aided testimony, Other offense.  *Error*, Harmless.

The judge at a criminal trial lasting eight days did not violate the defendant's right to a public trial by excluding spectators from the courtroom during fifteen minutes of voir dire and four minutes of cross-examination in order to obtain answers to certain questions asked by defense counsel in cross-examining a witness who had been reluctant to answer the questions for fear of retaliation. [548-551]

The court did not decide whether testimony by a witness whose memory had been enhanced by a hypnotist was properly admitted at a criminal trial where the testimony was essentially cumulative of the defendant's admissions and other testimony given at trial and consequently could not have prejudiced the defendant. [551-554]

There was no merit to a criminal defendant's contention that a question put by the prosecutor to a police officer was an attempt improperly to put before the jury evidence that had been excluded by the judge. [555]

Certain statements by a witness at a criminal trial which might have been interpreted as evidence of the defendant's commission of a prior crime did not prejudice the defendant where the judge gave curative instructions and where cross-examination by defense counsel made clear that a reference to the defendant's incarceration meant that the defendant was in jail awaiting trial in this case. [555-556]

The judge at a criminal trial did not abuse his discretion in denying the defendant's motions for severance and for a mistrial on the ground that the defendant's right to a fair trial was jeopardized by the alleged inexperience of counsel for a codefendant. [556-557]

INDICTMENT found and returned in the Superior Court Department on December 11, 1979.

The case was tried before *Brogna,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Thomas P. McCusker, Jr.,* for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant was indicted for murder in the first degree of Philip McGee. A jury convicted him of murder in the second degree, and he was sentenced to serve life imprisonment. He appeals. We transferred the appeal here from the Appeals Court on our own motion, the offense having been committed before July 1, 1979. *Commonwealth* v. *Davis,* 380 Mass. 1, 13, 16-17 (1980).

The defendant claims error on a variety of grounds. Only two issues have sufficient merit to require extended discussion. First, the defendant argues that the trial judge denied his constitutional right to a public trial by excluding the public from the voir dire of a witness and from a brief portion of the same witness's testimony before the jury. Second, the defendant argues that the trial judge committed prejudicial error in admitting testimony by a prosecution witness whose memory was hypnotically enhanced. The defendant's other claims of error are stated in the text of this opinion. We conclude there was no reversible error and therefore affirm the conviction.

The basic facts are these. Shortly after midnight on February 10, 1979, in the Hough's Neck neighborhood of Quincy, two police officers found Philip McGee on his hands and knees on a sidewalk. McGee had apparently been walking home from a neighborhood bar. There was blood all over his face, and injuries to his legs prevented him from standing.

McGee was taken to Quincy City Hospital by ambulance and died there sixteen days later. His death was caused by a pulmonary embolism resulting from multiple fractures in both legs. The pathologist testified that McGee's leg fractures could have been caused by an automobile, a blunt instrument such as a bat, or by an adult jumping up and down

on his legs. As a result of police investigation, the defendant was indicted for murder on December 11, 1979.[1]

Shortly before the police found McGee, a neighborhood youth, hiding behind some bushes, saw McGee lying face down in the same area. This young man testified that he saw the defendant walking toward him, with McGee's body just a few feet behind the defendant. Another witness testified that at approximately 1 A.M. of that morning she was awakened by fighting and arguing outside her house. She saw a car two feet from her side door with the defendant and a few others inside. She testified that two men were standing outside the car, and one said, "You didn't have to kill him."

Some time around February 10, the defendant came home with blood on his boots and pants and admitted to his roommate that he had just beaten someone. About a week later, the defendant again admitted to his roommate that he was the one who beat "that guy." The defendant also admitted the beating to two neighborhood girls, with threats of harm if the girls told anyone. Two other witnesses testified that on three occasions they heard the defendant state that he was a murderer. After being arrested and advised of his Miranda rights, the defendant admitted being at the scene of the beating and watching another jump up and down on McGee's feet and legs.[2] The defendant on three other occasions, however, told others he knew nothing about the beating or that he was not in the area at the time.

The Commonwealth presented other circumstantial evidence linking the defendant to the beating. The police took the defendant's boots at the time of his arrest, and a State police chemist testified to finding small crusts of human

---

[1] James F. Feeley was indicted as an accessory after the fact to the murder of McGee, but the jury found him not guilty after a joint trial with the defendant.

[2] On the second day of trial the defendant moved to suppress this statement made to the police after his arrest. The judge found that the defendant was advised of and understood his Miranda rights, and denied the motion. No claim of error is made as to this ruling.

blood on the toe area of one boot.[3]  On one occasion, some-
time after the beating and before McGee's death, the defend-
ant called Quincy City Hospital to inquire about someone's
condition; and another time, he began to call the hospital
but hung up after a friend present advised him that the
police would investigate. The Commonwealth also present-
ed evidence that the defendant had threatened or attempted
to intimidate probable and actual prosecution witnesses.

1. *Exclusion of public from courtroom.*  A witness testi-
fied that at 1 A.M., on the morning of the beating, she saw
the defendant and a few others in a car parked near her
house. She also heard a man standing next to the car say,
"You didn't have to kill him."  On cross-examination de-
fense counsel asked the witness whether she told anyone
about the incident.  After identifying her son as one person
she had informed, she refused to identify two other persons
whom she had told.  Defense counsel pressed the question
whereupon the judge, without objection, ordered the spec-
tators and jury cleared from the courtroom and began a voir
dire.[4]  During this fifteen-minute voir dire, the witness
stated that she told her two daughters about the arguing
and fighting outside her house without telling them who
was there or what was said.

The jurors returned to the courtroom after the voir dire,
and defense counsel, for the first time, objected to the exclu-
sion of the public during the voir dire and during the antici-
pated follow-up questions before the jury.  When cross-
examination resumed in the jury's presence, the witness
again testified that she told her daughters about the incident
without any details.  After defense counsel indicated that he
was finished questioning the witness about the conversa-
tions with her daughters, the judge reopened the courtroom

---

[3] Because the stain was too small, the chemist could not make a conclu-
sive test.

[4] The record is silent as to whether any members of the press were also
excluded.  The Commonwealth, in its brief, however, represents that one
newspaper reporter, later interviewed, stated that he was present during
the voir dire and subsequent testimony.

to spectators. The cross-examination and two bench conferences with the jury present lasted approximately four minutes. The trial consumed eight days.

The defendant contends that the fifteen-minute voir dire and four-minute cross-examination with spectators excluded from the courtroom violated his Sixth Amendment right to a public trial. Assuming, without deciding, that the defendant did not waive his right to a public trial during the voir dire,[5] we conclude there was no abuse of discretion in the trial judge's action in closing the court during the voir dire or during the four minutes of cross-examination before the jury.

This court has always recognized the right of a criminal defendant to be tried in an open court. *Globe Newspaper Co.* v. *Superior Court (Globe I)*, 379 Mass. 846, 855-856 (1980). *Commonwealth* v. *Bohmer*, 374 Mass. 368, 380 (1978). *Commonwealth* v. *Blondin*, 324 Mass. 564, 569-571 (1949), cert. denied, 339 U.S. 984 (1950). See also *Cowley* v. *Pulsifer*, 137 Mass. 392, 394 (1884) (judicial system should be open for public inspection). The right to a public trial, guaranteed by the Sixth Amendment to the Constitution of the United States, is applicable to our courts under the Fourteenth Amendment. *Commonwealth* v. *Bohmer, supra. Commonwealth* v. *Marshall*, 356 Mass. 432, 435 (1969). "This guaranty, the importance of which cannot be overstated, exists primarily to prevent the courts from becoming instruments of persecution." *Commonwealth* v. *Bohmer, supra.* See *In re Oliver*, 333 U.S. 257, 270 (1948); Note, Trial Secrecy and the First Amendment Right of Public Access to Judicial Proceedings, 91 Harv. L. Rev. 1899, 1902 (1978). Under the public gaze, witnesses, counsel, and the judge are more strongly moved to a strict consciousness of their duty, thus improving the quality and fairness of

---

[5] See *Commonwealth* v. *Williams*, 379 Mass. 874, 876 (1980) (defendant, through counsel, may waive right to public trial); *Commonwealth* v. *Wells*, 360 Mass. 846 (1971) (no improper denial of defendant's public trial when counsel failed to object). Cf. *Martineau* v. *Perrin*, 601 F.2d 1196 (1st Cir. 1979).

our judicial system. *Globe I, supra.* See *In re Oliver, supra*; 6 J. Wigmore, Evidence § 1834, at 438 (Chadbourn rev. 1976); 91 Harv. L. Rev. at 1905.

"This right to a public trial is not, however, absolute and inflexible." *Commonwealth* v. *Bohmer, supra.*[6] See *United States* v. *Ruiz*, 579 F.2d 670, 674-675 (1st Cir. 1978); 6 J. Wigmore, *supra*, § 1835, at 443. To ensure that the administration of the criminal law is fair and just, a trial judge has authority "to exclude spectators whose presence intimidates the witnesses." *Commonwealth* v. *Bohmer, supra.* See *United States ex rel. Orlando* v. *Fay*, 350 F.2d 967, 971 (2d Cir. 1965), cert. denied sub nom. *Orlando* v. *Follette*, 384 U.S. 1008 (1966) (no error to exclude defendant's sympathizers who attempted to intimidate and harass witness); *United States ex rel. Laws* v. *Yeager*, 448 F.2d 74, 81 (3d Cir. 1971), cert. denied, 405 U.S. 976 (1972) (exclusion of witness's relative whose presence hindered ascertainment of truth not error). In determining whether the trial judge abused his discretion in excluding the spectators, we examine the record before us.

The trial judge was faced with the witness's reluctance to identify the other persons whom she had told of the incident and with defense counsel's persistence in this line of inquiry; the judge observed the witness and heard testimony that there was frequent fighting outside of the witness's house, which had sustained considerable damage; that on two separate nights, including the night prior to trial, fireworks exploded on the roof of her house and that these were most likely set by the defendant's codefendant; and that the witness herself had not come forth with her testimony until a few weeks before trial. More importantly, however, the assistant district attorney represented to the judge during the voir dire that other witnesses waiting to testify were afraid

[6] Statutes which authorize limitation of access to court proceedings do not preclude the exercise by judges of sound discretion to impose reasonable closure in other cases when necessary. *Ottaway Newspapers, Inc.* v. *Appeals Court*, 372 Mass. 539, 546 (1977). Cf. *Globe Newspaper Co.* v. *Superior Court (Globe II)*, 383 Mass. 838, 845-848 (1981).

of both defendants and had come to court with great reluctance. The brief exclusion of the public was precisely tailored to obtain the particular defense-requested evidence, the evidence that this witness was most fearful of giving. Once the defense obtained its answers, the spectators were promptly readmitted. The judge's ruling struck an equitable balance between the requirement that the courts be open to public scrutiny and the need to have the trial proceed in an orderly manner. *United States ex rel. Orlando* v. *Fay, supra.* We conclude there was no abuse of the judge's discretion on the facts presented here.[7]

2. *Hypnotically aided testimony.* The Commonwealth presented testimony by a witness, Anne Hopkins, whose memory was enhanced by a hypnotist. Prior to its admission, the defense requested and obtained an evidentiary hearing on the admissibility of Hopkins's testimony. The hypnotist, Harold Edelstein,[8] testified that he "relaxed" Hopkins so she could concentrate fully on the event that she wanted to remember and answer questions to the best of her ability. The hypnotist did not ask any questions but concentrated on Hopkins to be sure she was comfortable and not getting irritated. In fact, Edelstein could not recall any specific questions that were asked or answered.

---

[7] Although a showing of prejudice is not required in order to reverse a conviction that is a result of a secret proceeding, *Commonwealth* v. *Marshall*, 356 Mass. 432, 435 (1969), that is not the case here. In the context of an eight-day trial, the brief exclusion of spectators necessary to obtain defense-related evidence did not result in the defendant's conviction by a secret proceeding. Contrast *In re Oliver*, 333 U.S. 257, 272-273 (1948) (defendant's public trial right denied when judge acting as one-man grand jury sentenced defendant to jail without benefit of counsel, no chance to summon witnesses in defense or cross-examination witnesses against him).

[8] Edelstein has been a hypnosis practitioner for about ten years; he is the director of the New England Institute of Hypnosis. Although he has taken psychology courses at a local university, he is not a psychologist or psychiatrist; nor does he hold any college or graduate degrees. The defendant makes no attack on the qualifications of the witness but rather argues generally that hypnotically induced testimony is inadmissible and that the procedural safeguards of reliability used here were inadequate.

The witness underwent hypnosis twice. At the first session, in addition to Edelstein and his assistant, a Quincy police detective and an assistant district attorney were present and questioned the witness. Edelstein videotaped five minutes of this session and later erased it. At the second session, two Quincy police detectives were present and questioned Hopkins about the investigation. Edelstein made an audio tape of this session and gave it to the police who subsequently lost it. The judge ruled that the Commonwealth had satisfied its burden to establish that the witness's memory was revived by hypnosis, and that no impermissible suggestions were made during the hypnotic interrogation.[9]

At trial, Hopkins testified to four incriminating statements the defendant had made. She testified that she remembered two statements prior to hypnosis, and two statements following hypnosis. The defendant objected to all of her testimony. The trial judge, however, ruled the witness was competent to testify. The defendant contends that the judge erred in admitting Hopkins's hypnotically enhanced testimony because the Commonwealth failed "to establish that the particular hypnotically aided testimony [had] sufficient reliability to justify its introduction in evidence." *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 734-735 (1980). We do not decide whether Hopkins's testimony was reliable enough to be admitted in evidence because, while this evidence might have been excluded,[10]

---

[9] The trial of this case occurred before our opinion in *Commonwealth* v. *A Juvenile*, 381 Mass. 727 (1980), was issued.

[10] The inherent problems with the use of hypnotically aided testimony in the courtroom should not be underestimated. Hypnosis is often defined as a state of heightened suggestibility where the subject may experience distortions of reality, fantasies, and false memories. See *State* v. *Mena*, 128 Ariz. 226, 228 (1981); *State* v. *Mack*, 292 N.W.2d 764, 765 (Minn. 1980); Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif. L. Rev. 313, 316 (1980); Dilloff, The Admissibility of Hypnotically Influenced Testimony, 4 Ohio N.U.L. Rev. 1, 3 (1977). The witness, who seeks to fill in the details of a particular incident only partially remembered, may confabulate and fill in his memory gaps with false memories or inaccurate bits of information. Diamond,

we cannot say that its admission was prejudicial error. *Commonwealth* v. *Bottiglio,* 357 Mass. 593, 598 (1970).

The witness's testimony, allegedly remembered prehypnosis, was that the defendant came to her home at about

*supra* at 335; Dilloff, *supra* at 5. Professor Diamond, who is both a professor of law at the University of California at Berkeley and a clinical professor of psychiatry at the University of California at San Francisco, in a recent law review article, stated: "I believe that once a potential witness has been hypnotized for the purposes of enhancing memory, his recollections have been so contaminated that he is rendered effectively incompetent to testify. Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist. After hypnosis the subject cannot differentiate between a true recollection and a fantasy, or a suggested detail. Neither can any expert or the trier of fact. This risk is so great, in my view, that the use of hypnosis by police on a potential witness is tantamount to the destruction or fabrication of evidence." Diamond, *supra* at 314. The trier of fact may be incapable of ascertaining whether the witness is testifying from his present memory of prior observations or is relating a memory planted by hypnosis. See *State* v. *Mena, supra* at 229; Diamond, *supra* at 330. The witness may be unable to distinguish between his prehypnotic and posthypnotic memory or to restrict his memory to actual facts, free from fantasies. Diamond, *supra* at 335-336. But cf. Note, Hypno-Induced Statements: Safeguards for Admissibility, 1970 J.L. and Soc. Order 99, 119 (absent evidence of impropriety, hypnotically induced testimony as credible as testimony given in waking state).

These difficulties have led a number of courts to hold that hypnotically induced testimony is per se inadmissible. See, e.g., *State* v. *Mena, supra* at 232; *State* v. *Mack, supra* at 772. Some courts have rejected this Draconian approach. See *State* v. *Hurd,* 86 N.J. 525, 545-546 (1981) (hypnotically induced testimony may be admissible subject to strict safeguards to ensure reliability of hypnotic procedure). The courts which allow hypnotically enhanced testimony in evidence recognize, however, the problems of the reliability of hypnotically induced testimony, i.e., the prospect that the state of heightened suggestibility will produce distortion; the possibility of deliberate fabrication; and the likelihood that the jury will accord undue significance to the testimony. However, such courts further recognize, as some authors suggest, that "[b]arring circumstances where these problems are so exaggerated as to become unwieldy, courts should continue to exercise their discretion to admit the testimony of witnesses whose flawed recollection of the occurrence at issue has been revitalized through pretrial hypnotic induction." Spector & Foster, Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?, 38 Ohio St. L.J. 567, 591-597 (1977). See also the authorities cited in *Commonwealth* v. *A Juvenile, supra.* We have not yet ruled on the question, nor need we do so on this record. Cf. *Commonwealth* v. *A Juvenile, supra* at 732-734.

1 A.M. on February 10 and told her that he and another had "just beat . . . some guy." This was substantially the same as the defendant's roommate's testimony that, on or about February 10, the defendant came home and told his roommate that he had just beaten someone. The other prehypnotic remembered testimony was that the witness overheard the defendant at a party say, "I'm the Hough's Neck murderer." This was identical to the testimony of another witness who was at the same party. Similarly, the posthypnotic statements could not have prejudiced the defendant when compared with the defendant's admissions to other witnesses and other evidence of guilt. The witness testified that before the defendant left her house on the night of the beating, he said, "If the cops come, tell them I've been here all night." The defendant had made statements to three other witnesses that he was not present when McGee was beaten or that he knew nothing of the incident. All of these statements were directly contradicted by the defendant's postarrest admission to a Quincy police detective that he was at the scene when McGee was beaten. The other posthypnotic recollection of Hopkins was that the defendant pointed out the tree "where [he] beat the guy up." The area where McGee was beaten was firmly established at trial by a witness who saw McGee lying there and testimony by the police officers who found McGee.

In assessing the likelihood of prejudice by the admission of the hypnotically aided testimony, "we may rightly consider the strength of the evidence against the defendant." See *Commonwealth* v. *Richmond,* 379 Mass. 557, 563 (1980). The defendant on three separate occasions admitted that he was a murderer or that he committed a murder, and on three other separate occasions he admitted that he was the one who inflicted the beating on McGee. Hopkins's hypnotically enhanced statements were essentially cumulative of the defendant's admissions and other testimony given at trial. The error, if any, in allowing her testimony did not prejudice the defendant.

3. *Other assignments of error.* (a) *Prosecutorial misconduct.* Prior to trial, the defendant moved to suppress statements made by him to Quincy police, including statements made when the police arrested him in Albuquerque, New Mexico. At the motion to suppress hearing, the trial judge ruled orally that such statements could be used by the Commonwealth. Later, however, at an unrecorded lobby conference, the judge apparently indicated that he may have failed to rule on the admissibility of the Albuquerque statements. At trial the prosecutor subsequently asked one of the officers if there was "any conversation" between him and the defendant in New Mexico. The question was not answered because the judge sustained the defendant's objection to the question after ruling in a bench conference that the defendant's statements were equivocal. The defendant contends that the prosecutor's question to the officer was an attempt to put before the jury evidence that had been excluded by the judge and, as such, was grounds for a mistrial. The prosecutor was entitled to rely on the judge's prior ruling. There was no impropriety.[11]

(b) *Evidence of separate crimes.* In response to a question by the prosecutor regarding a conversation between the witness and the defendant, the witness stated, "I asked [defendant] if he had to go to court about the Phil McGee matter; and [defendant] said, 'No. I have to go about something else.'" After the defendant objected, the judge told the jury to disregard the witness's statement and not to draw any inferences from it.[12] The defendant contends that this testimony amounted to evidence of a separate crime and

[11] The defendant in his brief alleges that "[a] careful reading of the transcript shows a pattern on the part of the Assistant District Attorney of asking questions that he knows are improper and forcing defense counsel to object and to approach the bench." We have read the transcript and find no pattern of improper questions by the prosecutor.

[12] The judge clearly and forcefully cautioned the jury: "Mr. Foreman and other members of the jury: Your [*sic*] are to completely ignore the statement of the witness of this conversation that he said he had with the defendant Stetson, in which he said Stetson said that he had to go to court on something else.

that the prejudice from such evidence was so substantial that curative instructions were useless and a mistrial was required as matter of law. See *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 815-816 (1973).

Although we do not understand the statement, "I have to go [to court] about something else," as evidence of a prior crime, the statement may be susceptible of such a meaning. If there was some chance of jury prejudice, the harmful effects of this evidence were offset by the judge's careful warning to the jury. *Commonwealth* v. *Clifford,* 374 Mass. 293, 298 (1978).

The defendant further contends that evidence of other crimes was proffered to the jury when the prosecutor asked the same witness whether he had visited the defendant in jail. When the judge asked the defendant's counsel for a suggested curative instruction, counsel replied that he wanted to find out when the witness visited the defendant in jail. "Last week," was the witness's reply to the prosecutor's question. Defense counsel made no further objection but explored the matter further on cross-examination of the same witness, making it clear to the jury that the defendant was in jail awaiting trial in this case. There was no error.

Because the jury knew that the defendant was in jail awaiting trial and was not incarcerated for a separate crime, we are not convinced that this evidence tainted the jury's verdict. Cf. *Commonwealth* v. *Billings,* 6 Mass. App. Ct. 884 (1978) (comment that conversation between the defendant and police had taken place in jail did not require reversal nor create adverse inference that the defendant was previously convicted of other crime). The judge did not abuse his discretion in denying the defendant's motion for a mistrial.

(c) *Denial of motion for severance.* Defense counsel, at the conclusion of the Commonwealth's case, moved for a

"It has nothing at all to do with this case.

"You are to draw no inferences from it that Stetson was going to court as an accused on anything, or anything other than a witness, or maybe for a parking ticket."

mistrial on the basis of the alleged inexperience of co-counsel, contending that co-counsel's trial tactics jeopardized the defendant's right to a fair trial.[13]  Before and during trial, the defendant moved to sever his case from that of his codefendant, and the judge denied the motions.[14]  We find no error in the judge's denial of a mistrial or severance.

The codefendant Feeley was tried and found innocent as an accessory after the fact to McGee's murder.  The Commonwealth's evidence against Feeley, in essence, was that the Quincy police executed a search warrant and found a bat in Feeley's house which Feeley later indicated was the murder weapon.  Feeley took the stand in his own defense and testified that he knew nothing of McGee's murder nor of the allegation that the defendant was involved.

Feeley's testimony did not directly or materially incriminate the defendant and could not have caused jury confusion. *Commonwealth* v. *Cepulonis,* 374 Mass. 487, 499 (1978). The motion for a severance or mistrial was a matter addressed to the sound discretion of the trial judge.  *Commonwealth* v. *Cepulonis, id.*  No abuse of such discretion has been shown here.  The defendant's right to a fair trial was adequately protected by the trial judge's limiting instructions, as well as the defendant's opportunity to confront and cross-examine his codefendant.

---

[13] There is nothing in the trial record or the defendant's brief indicating the exact "inexperience" of co-counsel.  At trial the defendant alleged that his co-counsel had "not been a member of the Bar for ten years [and] is not on the approved list."  The defendant, in his brief, cites Rule 51 of the Superior Court in support of his argument.  Assuming that the defendant is actually referring to Rule 53 of the Superior Court, as amended (1976) (Counsel in Criminal Cases), his reliance is misplaced.  The requirement in former Rule 53 that an attorney appointed as counsel in a murder case have ten years' experience was amended on May 8, 1976, striking the ten-year requirement.  Further, co-counsel was not assigned to be counsel in a murder case but to represent a defendant charged with being an accessory after the fact.

[14] The defendant does not contend that he was constitutionally entitled to a separate trial.  The codefendant took the stand and was subject to cross-examination.  *Bruton* v. *United States,* 391 U.S. 123 (1968).

4. *Review under G. L. c. 278, § 33E.* In accordance with our duty under G. L. c. 278, § 33E, we have considered the whole case on the law and the evidence, and we are satisfied that the evidence supports the verdict and that there was no miscarriage of justice. This is not an appropriate case in which to order a new trial or direct the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*