COMMONWEALTH vs. JAMES M. KATER.

Bristol. October 4, 1982. — March 23, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Hypnosis. Evidence,* Hypnotically aided testimony.

Discussion of the law relating to the admissibility, at the trial of criminal cases, of testimony from a witness who has been hypnotized. [524-531]

Inasmuch as experts do not generally accept the reliability of hypnosis as a method of refreshing recall, this court determined that, at a criminal trial, testimony from a witness who has been hypnotized concerning matters not remembered before hypnosis is inadmissible, and set forth guidelines for the admissibility of testimony from such a witness about events remembered prior to hypnosis and for conducting hypnotic sessions involving potential witnesses. [531-534]

This court concluded that there was a substantial likelihood of a miscarriage of justice at the trial of indictments charging murder and kidnapping where the evidence against the defendant was circumstantial and based on the testimony of four witnesses who had been subjected to hypnotic sessions, where testimony developed after hypnosis was introduced against the defendant, where the police did not conduct the hypnotic sessions in accordance with safeguards to assure that the prehypnotic memory of witnesses would not be affected, and where the jury had no guidance that hypnosis could have a negative rather than a positive effect on the reliability of the witnesses' testimony. [534-535]

In ordering a new trial for a defendant convicted of murder this court expressed its views on certain evidentiary issues likely to arise at retrial. [535]

INDICTMENTS found and returned in the Superior Court Department on November 28, 1978.

The cases were tried before *McGuire,* J., and a motion for a new trial was heard by him.

*Jonathan Shapiro* for the defendant.

*Lance J. Garth,* Assistant District Attorney (*Patricia O. Ellis & Phillip L. Weiner,* Assistant District Attorneys, with him) for the Commonwealth.

*Thomas G. Shapiro,* for Frederick Clay, amicus curiae, submitted a brief.

WILKINS, J.  In this appeal by the defendant from his convictions of murder in the first degree and kidnapping, we consider the admissibility of testimony from witnesses who have been hypnotized.  Aspects of this issue were before us in *Commonwealth* v. *A Juvenile,* 381 Mass. 727 (1980).  In our opinion in *A Juvenile,* we declined to take an authoritative position because of the absence of findings of facts on possibly important matters.[1]  *Id.* at 729.  We did, however, indicate considerations that might be material in resolving the issue.[2]  In this case and in the case of *Commonwealth* v. *Watson, post* 536 (1983), decided today, we have appellate records as adequate as we might reasonably expect, and we now decide questions concerning the admissibility of testimony from witnesses who have been hypnotized.

Our first conclusion is that testimony by a witness as to a fact that became available following hypnosis is generally inadmissible in the trial of criminal cases in the Commonwealth.  The exclusion of what we have characterized as hypnotically aided testimony is consistent with the views recently expressed in the better reasoned opinions of other courts in this country.  Hypnosis simply lacks general ac-

---

[1] This question was also raised in *Commonwealth* v. *Stetson,* 384 Mass. 545, 551-554 (1981).  Although we discussed the subject generally (*id.* at 552 n.10), we concluded there that the admission of testimony from a witness who had been hypnotized, even if error, was not prejudicial in the circumstances.

[2] In the *Juvenile* case, where the witness was unable to make any reliable identification before hypnosis, we were concerned with what we called "hypnotically aided testimony," that is, "testimony that was not available from the hypnotized witness before hypnosis and became available from that witness after hypnosis." *Id.* at 729 n.3.  This case involves not only new testimony of this character but also the consequences of the effect of hypnosis itself on a witness.  The defendant argues that an hypnotized witness becomes more confident of his memory and is "aided" in that sense.  We shall continue to refer to testimony first made available from a witness after hypnosis as hypnotically aided testimony.

ceptability by experts in the field as a reliable method of enhancing the memory of a witness.

Although we announce a rule barring the introduction of hypnotically aided testimony, as we have defined it, we conclude secondly that a witness may testify based on what he knew before hypnosis. Only one jurisdiction, at this time, excludes testimony based on prehypnotic memory. For the future, we suggest certain guidelines for the introduction of testimony based on a witness's prehypnotic memory. We do not, however, impose any guidelines on the admissibility of testimony based on the prehypnotic memory of a witness hypnotized before the date of this opinion.

As applied to the facts of this case pursuant to our duty of review under G. L. c. 278, § 33E, these principles require a new trial for the defendant. There was hypnotically aided testimony introduced against him. That testimony may have had an effect on the guilty verdicts. The introduction of hypnotically aided testimony presents a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Tavares,* 385 Mass. 140, 148 (1982). Because, however, we conclude that, even apart from the hypnotically aided testimony, there was sufficient evidence to warrant guilty verdicts, a new trial is required. We shall consider briefly such other issues argued on appeal as are likely to arise at the new trial.

We summarize the evidence that the jury could have found. This evidence, as we have said, was sufficient to satisfy the jury of each element of the crimes charged beyond a reasonable doubt. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979).[3] We exclude, for the moment, as to any witness who had been hypnotized those facts "recalled" only after hypnosis.

[3] Comparing the facts of this case with cases in which we have held the evidence was insufficient to warrant a guilty verdict (see *Commonwealth* v. *Curtis,* 318 Mass. 584 [1945]; *Commonwealth* v. *O'Brien,* 305 Mass. 393 [1940]), and with the cases in which we have held that circumstantial evidence was sufficient to warrant a guilty verdict (see *Commonwealth* v. *Connors,* 345 Mass. 102, 105 [1962]; *Commonwealth* v. *Eppich,* 342 Mass. 487, 492-493 [1961]), we conclude that the case was one for the jury.

On November 11, 1978, a Freetown police officer found the partially decomposed body of Mary Lou Arruda tied to a tree in the Freetown State Forest. Mary Lou, a high school student, had been missing since the afternoon of September 8, 1978. A newsboy found Mary Lou's bicycle sometime after 4 P.M. that day, lying on the ground alongside Dean Street in Raynham near her home. He called for Mary Lou, received no answer, and took the bicycle to the Arrudas' home on Church Street. A short time earlier Helena McCoy, while walking on Dean Street, met Mary Lou. Mary Lou was on her bicycle. They spoke for a few minutes and parted, going in opposite directions. McCoy had twice seen a green motor vehicle before seeing Mary Lou. She identified the defendant as the driver of that vehicle and his green Opel as the one she had seen twice on September 8 on Dean Street. McCoy also had seen a dirty blue car on Dean Street. That car was operated by one Albert Santos, Jr. He saw McCoy on Dean Street as well as another young girl on a bicycle. He also saw a green motor vehicle at two locations on Dean Street as he came and went from an errand at a grain store nearby. Santos identified the defendant's green Opel as the vehicle he had seen. Sheila Berry, driving along Dean Street about 4 P.M., also saw a green vehicle. She had a close look at the driver and noticed an object in the front of the car. She identified the defendant and his green Opel, respectively, as the driver and the motor vehicle she had seen that afternoon. Barbara Lizotte saw the defendant's Opel at the corner of Dean and Church Streets shortly after 4 P.M. that day. She thereafter saw a bicycle lying in the bushes along Dean Street and saw the newsboy at the end of the street. The victim's mother saw the defendant's Opel on Church Street shortly after 4 P.M.

Extensive investigation led the police to question the defendant. He owned a lime green 1976 Opel. Two cartons of Benson & Hedges cigarettes were found in his car. A policeman had found an unlit Benson & Hedges cigarette on the ground along Dean Street. The Opel had a nine-inch black mark, 31 5/8 inches from the ground, along the black

strip on its right front fender. Mary Lou's bicycle had a rubber plug around the left end of the handlebar. The plug was 30 ½ inches from the ground and 9/16 of an inch wide, the widest portion of the black mark on the defendant's Opel. The newsboy had noticed a hand print in the soil near where he had found Mary Lou's bicycle. A police officer also found a tire print. Because of an uneven tread and a defect in the Opel's right front wheel bearing, and for other reasons we need not detail, the prosecution was able to relate the tire print to the defendant's Opel.

Other relevant evidence bore on the defendant's guilt. He made a statement to the police concerning his whereabouts on the afternoon of September 8. That statement was contradicted, or made doubtful, in certain respects by the testimony of various witnesses. Although the defendant had had his car washed at 1 P.M. that day, he took the car to a car wash again late in the afternoon.

Four witnesses had been subjects of hypnotic sessions in the course of the investigation, Helena McCoy and Sheila Berry twice, and Albert Santos and Barbara Lizotte once. Defense counsel believed at trial that McCoy and Berry had been hypnotized. He challenged their testimony on that ground. After conducting a voir dire, the judge ruled their testimony admissible. Defense counsel did not object to the admission of their testimony following the voir dire.

New counsel was appointed to conduct the appeal. After the appeal had been entered here, he filed a motion in this court for leave to file a motion for a new trial. See G. L. c. 278, § 33E. The motion was referred for recommendation to a single justice of this court. We accepted his recommendation that the motion be remitted "to the trial court for an evidentiary hearing and written findings with respect to any available grounds urged by the defendant for a new trial." That motion raised various grounds, including a challenge to the admission of testimony from hypnotized witnesses.

The trial judge heard evidence on the motion for a new trial and made extensive findings and rulings. He denied

the motion. He made no finding as to whether the four witnesses who were purportedly hypnotized were in fact hypnotized. Dr. Martin Orne, who testified at the hearing on the motion for a new trial for the defendant as an expert on hypnosis, gave an opinion that at least three of them, including Sheila Berry, had been hypnotized. The Commonwealth offered no expert testimony on the subject of hypnosis. For the purposes of this case, we find that these three witnesses were hypnotized.

The record and the judge's findings show that the procedures used in conducting the hypnotic sessions were not appropriate for assuring, as far as possible, that a record would be made of what each witness knew before hypnosis, what the hypnotist knew of the crimes, and what occurred just before and during each session. People who preferably should not have attended sessions were present. The "hypnotist" was a police officer, whose qualifications the motion judge doubted to the point of not permitting him to give an opinion whether the witnesses had been hypnotized.

The judge concluded that the defendant failed to establish that the "hypnotic" sessions developed any additional substantial or material facts or changes in testimony and that the testimony of Helena McCoy and Sheila Berry was the product of their memory as opposed to the product of hypnosis. The burden of proof is, however, on the Commonwealth to show the reliability of the testimony of its witness who has been hypnotized. *Commonwealth* v. *A Juvenile*, 381 Mass. 727, 734 (1980). We would place the same burden on the Commonwealth as to any witness subjected to attempted hypnotism. Moreover, testimony was introduced at trial that was available from Sheila Berry following her hypnosis but not before. We shall discuss this hypnotically aided testimony and its significance subsequently. We turn first to a discussion of the law relating to the admissibility of testimony from a witness who has been hypnotized.

We forbear from an exhaustive presentation of the various views of experts on hypnosis and from a detailed

discussion of the opinions of other courts. Much of the background is set forth in our opinions in *Commonwealth* v. *A Juvenile*, 381 Mass. 727 (1980), and *Commonwealth* v. *Stetson*, 384 Mass. 545, 552 n.10 (1981), and in opinions we shall cite. The early view of the admissibility of a witness's posthypnotic testimony was that the fact of hypnosis went only to the weight of the evidence. *Commonwealth* v. *A Juvenile, supra* at 729-730. The leading opinion representative of this position was *Harding* v. *State,* 5 Md. App. 230 (1967), cert. denied, 395 U.S. 949 (1969). It is significant that the Maryland Court of Special Appeals, now differently constituted to be sure, has abandoned the position stated in its *Harding* opinion and now holds that testimony developed through hypnotism is inadmissible. See *Collins* v. *State,* 52 Md. App. 186, 205 (1982); *Polk* v. *State,* 48 Md. App. 382, 394 (1981).

We noted in *Commonwealth* v. *A Juvenile, supra* at 730-731, that certain other courts had approached the admissibility of hypnotically aided testimony by seeking to determine, according to the test first stated in *Frye* v. *United States,* 293 F. 1013, 1014 (D.C. Cir. 1923), whether the reliability of hypnosis as a means of refreshing recollection had gained general acceptance by experts in the field. In our opinion, we observed that "[t]he *Frye* rule deals with the admissibility of expert testimony based on the application of scientific principles. Hypnotically aided testimony is different in character, but consideration of the *Frye* rule, or some modification of it, may nevertheless be appropriate in such a situation." *Commonwealth* v. *A Juvenile, supra* at 732. Relying on the difference between evidence produced by hypnosis and evidence available from scientific tests, the Commonwealth argues that the *Frye* rule, which we have applied to such scientific techniques as voiceprints (*Commonwealth* v. *Lykus,* 367 Mass. 191, 196 [1975]), and polygraph examinations (*Commonwealth* v. *Vitello,* 376 Mass. 426, 443 n.17 [1978]), is not applicable to hypnosis, and that the rule should be applied only when a scientific process is being used to measure a phenomenon and to inter-

pret that measurement. Hypnosis, in contrast, the Commonwealth argues, only refreshes a witness's memory, and that witness then testifies to what he or she observed.

We believe the reasoning behind the *Frye* rule applies to hypnotically aided testimony. The basic question is not so much whether the process is scientific but rather whether a jury can realistically evaluate the effect of hypnosis. Unless there is general scientific acceptance of hypnosis as a reliable means of refreshing recollection, the dangers and possibilities of prejudice in the use of hypnotically aided testimony should bar its admission. See *State ex rel. Collins* v. *Superior Court,* 132 Ariz. 180, 198-199 & nn.3 & 4 (1982). We accept the idea that jurors, aided by cross-examination, may be expected to be able to evaluate the effects of bias, leading questions, and the problems of eyewitness testimony itself, but a different question is presented as to whether jurors can realistically evaluate the effects of hypnosis on testimony developed through hypnosis.

We could adopt a rule that allowed each party to offer expert testimony on the effects of hypnosis in each particular case. A few courts have recently taken that course. *State* v. *Hurd,* 86 N.J. 525, 538 (1981). *State* v. *Beachum,* 97 N.M. 682, 690 (Ct. App. 1981). Such a time-consuming and expensive course is precisely what the *Frye* test seeks to avoid. Unless there is general acceptance by experts in the field that in the circumstances hypnosis reliably assists a witness in refreshing his or her memory, and does not result in a high possibility of confabulation,[4] it is simply not worth miring the judicial process in individual determinations. A substantial majority of courts that have dealt with this question in recent years have decided that the *Frye* test applies in determining the admissibility of hypnotically aided testimony. See *State ex rel. Collins* v. *Superior Court,* 132 Ariz. 180, 199-202 (1982); *People* v. *Shirley,* 31 Cal. 3d 18, 40,

---

[4] "Confabulation" has been defined as "a filling in of gaps in memory by free fabrication." Webster's Third New Int'l Dictionary 475 (1961).

modified, 31 Cal. 3d 918a (1982); *Polk* v. *State*, 48 Md. App. 382, 394 (1981); *State* v. *Mack*, 292 N.W.2d 764, 768 (Minn. 1980); *People* v. *Hughes*, 88 A.D.2d 17, 19-21 (N.Y. 1982); *Commonwealth* v. *Nazarovitch*, 496 Pa. 97, 101 (1981). See also *State* v. *Hurd*, 86 N.J. 525, 536, 538 (1981) (hypnosis satisfies *Frye* in certain instances); *State* v. *Beachum*, 97 N.M. 682, 690 (Ct. App. 1981) (same). Other courts have not considered the acceptance of hypnosis by experts in the field as significant and have regarded the fact of hypnosis and its effects as questions for the trier of fact. See *Clark* v. *State*, 379 So. 2d 372, 375 (Fla. Dist. Ct. App. 1979) (*Frye* case not mentioned); *State* v. *Greer*, 609 S.W.2d 423, 433-435 (Mo. Ct. App. 1980) (no impermissible suggestion shown); *,State* v. *McQueen*, 295 N.C. 96, 119-123 (1978) (*Frye* case not mentioned).

The Commonwealth in seeking to introduce hypnotically aided testimony has the burden of showing the general acceptance by experts in the field of the reliability of such testimony. See *Commonwealth* v. *A Juvenile, supra* at 734; *Commonwealth* v. *Lykus*, 367 Mass. 191, 196 (1975) (voiceprints); *People* v. *Shirley, supra* at 54; *State* v. *Beachum, supra* at 690. In determining whether experts generally accept the reliability of such evidence, we may properly consider not only the testimony of experts in the record before us but also articles written by experts and the conclusions of other courts. See *Commonwealth* v. *Vitello*, 376 Mass. 426, 431 (1978); *Commonwealth* v. *Lykus, supra* at 199; *State ex rel. Collins* v. *Superior Court, supra* at 199; *Collins* v. *State*, 52 Md. App. 186, 205 (1982). Rather than showing a general acceptance of the reliability of hypnotically aided testimony, the views of experts on hypnosis indicate that it is an unreliable means of enhancing recall.

It is sufficient for our purposes only that experts do not generally accept the reliability of hypnosis as a method of refreshing recall. We need not expand on the reasons for their views in order to conclude that hypnotically aided testimony is inadmissible. However, we point briefly to some of the reasons they advance. Memory is said not to be

like a videotape, which accurately records every perception and needs merely to be played back. An hypnotized person tends to become attuned to the hypnotist and tends to desire to please him, responding even to subtle suggestions in the hypnotist's questions and manner. This desire may well cause the subject to fill in gaps in his memory, unconsciously to confabulate. Hypnosis decreases the subject's critical judgment. Moreover, there is no way for the hypnotist or any other observer to distinguish during the hypnotic session between actual memory and pseudomemories.

There is a final consideration that bears not only on the witness's hypnotically aided testimony but also on his characteristics as a witness. Subjects show increased confidence in the veracity of recollections reported under hypnosis, regardless of their accuracy. Reinforcement during hypnosis may, therefore, affect the subject as a witness. It is this latter circumstance, a tendency toward immunization from meaningful cross-examination that leads the defendant to argue that a person, once hypnotized, should be forever barred as a witness to events discussed during hypnosis.[5]

Although we conclude that testimony from an hypnotized witness concerning matters not remembered before hypnosis is inadmissible, we do not go so far as to disqualify the witness from testifying as to matters recalled beforehand.[6]

---

[5] For a more complete discussion of the problems, perceived by experts, of hypnosis on testimony from previously hypnotized witnesses, see *State ex rel. Collins* v. *Superior Court*, 132 Ariz. 180 (1982); *People* v. *Shirley*, 31 Cal. 3d 18, 51-56 (1982), and cases cited in those opinions. Although the Supreme Court of California has adopted the most restrictive position on the admissibility of testimony from a previously hypnotized witness, that court did not go so far as to disqualify the witness entirely. The California court would admit testimony from a previously hypnotized witness as to events that were not the subject of any consideration during hypnosis. *Id.* at 67.

[6] We recognize that a loss of memory due to physical trauma may stand in a different category and that, in such a case, experts might conclude that hypnosis has an acceptable role in restoring memory.

Hypnotism may be a necessary tool in investigations conducted by the police. We would not hold inadmissible other evidence discovered as a

Certainly, testimony about matters that were not the subject of inquiry in the course of hypnotism would not be suspect. See *People* v. *Shirley, supra* at 67. Even as to matters discussed during hypnosis, a witness's testimony as to prehypnotic memory should not be inadmissible in all events.[7] We grant, however, that the witness's manner and confidence may be affected. Thus, the fact of hypnosis and its likely effect on a witness are proper matters for inquiry at trial. A careful record of the witness's prehypnotic memory should be preserved. The procedural safeguards listed numerically in *Commonwealth* v. *A Juvenile, supra* at 732 n.8, present reasonable guides in conducting any hypnotic

---

result of the hypnotism of a witness. In fact, if the memory restored by hypnotism is corroborated by tangible evidence (such as finding physical evidence), a case for the reliability of the testimony of an hypnotized witness as to the corroborated fact could well be made.

We also recognize that a criminal defendant who has been hypnotized may have a constitutional right to testify, even if his testimony includes memory aided by the hypnosis. See *People* v. *Shirley, supra* at 918c.

[7] Of the courts that have ruled hypnotically aided testimony inadmissible, only California now goes further and declares such a witness disqualified in all respects as to events that were the subject of an hypnotic experience. See *People* v. *Shirley, supra* at 66-67 ("the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward"). California has noted the possibility that the testimony of a previously hypnotized witness given at a prehypnotic preliminary hearing might be admissible because, due to the hypnotism, the witness becomes unavailable as a witness to events that were the subject of inquiry during hypnosis. *Id.* at 71-72 n.60.

We view the following courts explicitly, or by implication of the language of their opinions, as having approved the admission of testimony based on prehypnotic memory, although rejecting the admission of hypnotically aided testimony. See *State ex rel. Collins* v. *Superior Court*, 132 Ariz. 180, 209 (1982); *Collins* v. *State*, 52 Md. App. 186, 205 (1982) (by implication); *People* v. *Wallach*, 110 Mich. App. 37, 72-73 (1981); *State* v. *Mack*, 292 N.W.2d 764, 771 (Minn. 1980); *State* v. *Palmer*, 210 Neb. 207, 218 (1981) (by implication); *People* v. *Hughes*, 88 A.D.2d 17, 22 (N.Y. 1982) (by implication); *Commonwealth* v. *Taylor*, 294 Pa. Super. 171, 175 (1982) (applying *Commonwealth* v. *Nazarovitch*, 496 Pa. 97 [1981]).

session involving a person whose prehypnotic memory may be offered in evidence.[8]

The rule we announce barring the use of hypnotically aided testimony, and making its admission reversible error where it was prejudicial to a defendant, applies to all cases coming to us in which the issue was properly preserved for appellate review. From the date of our opinion in *Commonwealth* v. *A Juvenile,* 381 Mass. 727 (1980), we would expect counsel to have raised a timely objection to the admission of testimony from a witness who had been hypnotized and would view unfavorably an attempt to raise the issue for the first time on a motion for a new trial in such a case. We would expect the Commonwealth and defense counsel to make a voluntary disclosure that a witness had been hypnotized or subjected to attempted hypnotism.[9]

The position we announce concerning the admissibility of testimony from a witness about events remembered prior to hypnosis, where appropriate safeguards are followed in conducting the hypnotic session, applies only to hypnotic sessions conducted after the date of this opinion. The proponent will have the burden of establishing what the witness remembered prior to the hypnosis. Any uncertainty

---

[8] Although we have endorsed as acceptable the safeguards espoused by Dr. Orne, a nationally recognized expert in hypnosis who testified for the defense, and although these or similar safeguards apparently have been approved by various law enforcement agencies and have been approved by certain courts, they should not be applied inflexibly. There may be occasions in which the hypnotist need not be a licensed psychiatrist or psychologist. The important point is that he be qualified in the use of hypnosis and otherwise independent of the investigation of the crime. There may also be situations in which a person in addition to the subject and the hypnotist (such as a parent of a child) could be present before, during, and after the hypnosis.

Certainly we would not require that all interrogations of potential witnesses be tape-recorded, but we do regard as important the preservation of what a witness knew immediately before hypnotism.

[9] The rules we announce seem equally applicable to the use of hypnotized witnesses in civil cases, but obviously that question is not before us. The Supreme Court of Arizona has said that its position on this subject applies to civil as well as to criminal matters. See *Lemieux* v. *Superior Court,* 132 Ariz. 214, 217 (1982).

on this score must be resolved in the opponent's favor. The question of the admissibility of such testimony from a witness who has been hypnotized is initially for the judge, preferably pursuant to a motion to suppress or a motion in limine. If the judge admits such testimony, its opponent must be given the opportunity to demonstrate at trial the possible effect of hypnosis, and of the way in which a particular session was conducted, on the witness's testimony and sense of certainty. If the evidence warrants it, an opponent of the admission of such testimony would be entitled, on request, to an instruction to the jury that in assessing the credibility of any such witness they may consider the consequences of (a) the fact that a witness underwent questioning while hypnotized and (b) the circumstances under which the hypnotic session was conducted.

We recognize that the result of our opinion in this case will be to reduce substantially the likelihood of the use of hypnosis for the purposes of developing evidence admissible against a criminal defendant, as long as the opinion of experts in the field concerning the reliability of hypnosis remains as it is. Our decision is founded on current scientific learning which shows the unreliability of hypnosis as a method of refreshing memory. Hypnotism might well seem to jurors as a process capable of enhancing memory infallibly, when, in fact, that is far from true.

We might have, of course, declared any witness disqualified from testifying to events that were the subject of inquiry in the course of an hypnotic session, even events remembered before hypnosis. Such a rule could be applied with relative ease; it would make the least demand on judicial resources. We do not, however, favor such an absolute rule at this time. We have left open the opportunity in the future to hypnotize a witness, pursuant to safeguards, without absolutely disqualifying him from testifying to his prehypnotic memory of events. However, hereafter, police and prosecutors who desire to hypnotize a potential witness will have to proceed with care.

We come then to the question of what principles to apply to this case in which the hypnotic sessions, indeed the trial,

preceded our November 4, 1980, opinion in *Commonwealth* v. *A Juvenile*, 381 Mass. 727 (1980). We start with a summary of the hypnotically aided testimony that was introduced at trial and then consider its possible impact on the jury's verdicts, recognizing that, in the absence of objection at trial, the issue is before us only on the standard set forth in G. L. c. 278, § 33E.

At trial Sheila Barry testified without objection that the man she saw driving on Dean Street on September 8 wore a short-sleeved shirt and had hair on his arm. The driver had "a blanket object or just a bulk object" to the left of him as she looked at the driver. His right arm was more or less behind the object. At the hearing on the motion for a new trial, Berry testified that she recalled the bulky object before hypnosis but that afterward she recalled that the driver's right arm was stretched out across the passenger's side as if he were holding some object, that the arm was particularly hairy, and that the material of the bulky object was "like a blanket type." The police found a blanket in the defendant's Opel. From this record, we cannot determine whether the driver's hairy arm or the blanket-like material were mentioned during either of Barry's two hypnotic sessions. At trial Berry testified on cross-examination that the fact that the hairy arm extended over the object "popped" into her mind a couple of days after hypnosis, but she did not remember mentioning it during the session.[10]

The subject of a hairy arm is not inconsequential because, in his closing argument to the jury, the prosecutor said, but without objection, "you've never seen [the defendant] with a short-sleeved shirt in this courtroom on those hot days. Ask yourselves why. Why does he come in here every day with long sleeves, when he has heard Sheila Berry testify she saw

---

[10] At trial, Albert Santos testified that the car he identified had high-backed seats and cardboard across the trunk. These facts were not included in a statement he gave to police before his hypnosis. Although under the rule we announce today, such additional testimony was hypnotically aided and therefore inadmissible, we believe the error, standing alone, was harmless, since it was merely cumulative of other testimony.

the man with the hairy arms?" There was no other evidence in the record tending to show that the defendant had hairy arms. The prosecutor properly could have requested the defendant to display his arms in the course of the trial. See *Commonwealth* v. *Brennan*, 386 Mass. 772, 781 (1982); *Commonwealth* v. *Burke*, 339 Mass. 521, 534-535 (1959). He did not do so. Comment on what has happened in the courtroom before the jury and on a defendant's appearance is appropriate. See *Commonwealth* v. *Borodine*, 371 Mass. 1, 11 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Valliere*, 366 Mass. 479, 494 (1974). Comments, however, on what was not brought before the jury are not proper, particularly a comment that suggests that the prosecutor has particular knowledge of a fact not in evidence. See *Commonwealth* v. *O'Brien*, 377 Mass. 772, 778 (1979); *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 421-422 (1978).

Our task, in the absence of an issue based on timely objection, is to review the entire record pursuant to G. L. c. 278, § 33E, to determine whether there is a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Tavares*, 385 Mass. 140, 148 (1982). Where argument has been based on developments in constitutional law since trial, we have on occasions not required "clairvoyance on the part of defense counsel" and have considered an issue, in the absence of timely objection, as if it were here for review in the regular course. See *Commonwealth* v. *Stokes*, 374 Mass. 583, 588 (1978). Although it might be argued that in certain respects the introduction of hypnotically aided testimony and the admission of certain testimony from a previously hypnotized witness present a constitutional question, we have not viewed the issue on this record as one involving constitutional principles.

The issue, however, does concern the all-important factfinding process. We have stated the rule for the future that hypnotically aided testimony is not admissible and that, if a witness is hypnotized, the opponent is entitled to demonstrate the possible effect of hypnosis on that witness's con-

fidence and manner in presenting testimony from prehyp-
notic memory. In this case, the evidence against the de-
fendant was circumstantial. No one was a witness to the
killing. No one saw the victim and the defendant together.
To be sure, reasonable inferences could be drawn. But
without the testimony of the four witnesses who may have
been hypnotized, the Commonwealth had no case. Testi-
mony, arguably persuasive, developed after hypnosis was
introduced against the defendant in this case. The police
did not conduct the hypnotic sessions to any significant
degree in accordance with safeguards that would tend to
assure that the prehypnotic memory of witnesses would not
be affected. The jury had no guidance that hypnosis could
well have a negative rather than a positive effect on the
reliability of witnesses' testimony. In these circumstances,
we conclude that there is a substantial likelihood that a
miscarriage of justice has occurred and, therefore, order a
new trial.

We take no pleasure, in fact we harbor a degree of con-
cern, that a time-consuming and costly retrial must be held.
At the time of the hypnotic sessions in this case, there was a
respectable body of law and scientific discussion raising
doubts about the admissibility of hypnotically aided testi-
mony and, even where admissible, setting forth proper pro-
cedures to be followed in conducting hypnotic sessions.
However, until our 1980 opinion in *Commonwealth* v. *A
Juvenile,* 381 Mass. 727 (1980), the extent of the problem
within this Commonwealth may not have been fully recog-
nized. Our task, not always an easy one, is to preserve the
interests of justice, both for the Commonwealth and the ac-
cused. On this record, the risk of a miscarriage of justice is
too great for us to let stand the defendant's conviction of
murder and his sentence to imprisonment for life without
the possibility of parole.

At the retrial of this case, based on our study of the
record, we conclude that the hypnotized witnesses may tes-
tify only as to their present memory of events known to
them prior to hypnosis. The defendant may, if he wishes,

present evidence bearing on the effect of hypnosis on a particular witness and on witnesses in general. He may also present evidence tending to show that each hypnotic session, and any attempted hypnotic session, was conducted in a manner likely to affect both a witness's present memory of events and a witness's degree of confidence in his or her memory. The Commonwealth, of course, will be free to present evidence to the contrary. This solution is not entirely satisfactory. It will not be easy for lay witnesses to limit themselves to their prehypnotic memory. We reject, however, a "solution" that would effectively bar any retrial, and, for the reasons given, we also reject the idea that the consequences of hypnosis should be totally ignored and the convictions affirmed.

We comment briefly on evidentiary issues that may arise at the retrial. The prosecutor was entitled to comment on the fact that the defendant had changed his hairstyle between the time of the crime and the time of trial. See *Commonwealth* v. *Sullivan*, 354 Mass. 598, 614 (1968), cert. denied, 393 U.S. 1056 (1969). Evidence as to the black mark on the right front of the defendant's car was relevant as tending to show that the car struck the victim's bicycle. See *Commonwealth* v. *Drayton*, 386 Mass. 39, 48 (1982). Similarly, testimony about the Benson & Hedges cigarette found along Dean Street was admissible as it tended to show that the defendant was in the area. There was no error in admitting a photograph of the defendant that Helena McCoy testified was consistent with the appearance of the person she saw driving the green car on September 8. The admission of expert testimony concerning the tread marks found at the edge of Dean Street from a person who was an expert in the design and manufacture of tires was within the discretion of the trial judge. See *Commonwealth* v. *Vitello*, 376 Mass. 426, 441 (1978); *Commonwealth* v. *Devlin*, 365 Mass. 149, 152 (1974).

The order denying the defendant's motion for a new trial is vacated. The judgment is reversed, the verdict is set aside, and the case is remanded to the Superior Court for further proceedings.

*So ordered.*